99 A.3d 11

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Richard HACKETT, Appellee.**

Supreme Court of Pennsylvania.

Submitted Aug. 29, 2013.

Decided Aug. 18, 2014.

568

570

Hugh J. Burns, Jr., Esq., Kristen Ann McDonald, Esq., Philadelphia District Attorney's Office, Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

Norris E. Gelman, Esq., Philadelphia, for Richard D. Hackett.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice STEVENS.

Following our remand in this capital case, the Commonwealth appeals the order of the Court of Common Pleas of Philadelphia County granting Appellee Richard Hackett's petition pursuant to the Post Conviction Relief Act (PCRA).[1] Upon determining that Appellee has proven that he is "mentally retarded" as defined by this Court in *Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624 (2005), and thus, is exempt from execution in accordance with the United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the PCRA court set aside Appellee's death sentence. As the PCRA court made findings which are not supported by substantial evidence of record and made an error of law by improperly equating borderline intellectual functioning with mental retardation (intellectual disability),[2] we reverse the PCRA court's order vacating Ap-

1. 42 Pa.C.S. §§ 9541–9546.

2. Although the term "mental retardation" was previously accepted by the professional community and routinely employed in decisions reviewing challenges under *Atkins*, the United States Supreme Court recently approved the replacement of the term "mental retardation" with the more politically correct phrase "intellectual disability" to describe the identical diagnosis. *Hall v. Florida*, —— U.S. ——, 134 S.Ct. 1986, 1990, 188 L.Ed.2d 1007 (U.S.2014). The *Hall* Court noted that the impetus for the shift in its language was the American Psychological Association's decision to implement the new term into the fifth edition of its Diagnostic and Statistical Manual of Mental Disorders (DSM–5), which was published in May 2013. While we acknowledge

pellee's death sentence and dismiss his petition for collateral relief.

## I. FACTS AND PROCEDURAL HISTORY

The Commonwealth charged Appellee with first-degree murder, conspiracy, and related offenses and notified him of its intent to seek the death penalty in connection with the 1986 death of sixteen-year old Maureen Dunne, who was brutally stabbed while she lay sleeping in bed with her boyfriend, Gregory Ogrod.[3] At Appellee's 1988 trial, the Commonwealth presented evidence that Appellee orchestrated a conspiracy to kill the victims with Marvin Spence, James Gray, and Keith Barrett. In the early morning hours of July 31, 1986, three men entered Ogrod's home and repeatedly stabbed the couple and clubbed them with crowbars. Despite this unforeseen attack, Ogrod got up and fought off his assailants. Nevertheless, Dunne died from a stab wound to the heart. As the perpetrators fled, Ogrod recognized Spence as one of his attackers. Appellee, who lived in Ogrod's home, knew Ogrod and Dunne were sleeping in the basement and was the only person, aside from Ogrod and his brother, who had a key to the home.

Although evidence showed Appellee and Spence directed the conspiracy, the men wanted Ogrod killed for different reasons. Appellee's aversion towards Ogrod developed in the spring of 1986 after Ogrod's brother invited Appellee to live in the home he and Ogrod shared. Even though Appellee managed to live there rent free and stored equipment for his landscaping and snow removal business in Ogrod's garage, Appellee did not get along with Ogrod. When Ogrod asked Appellee to move out

the change in nomenclature, we note that as this case was litigated before *Hall* was decided, the parties and their experts used the prior term frequently to distinguish between learning disabilities and mental retardation in order to specifically diagnose Appellee's mental condition. To avoid confusion under these particular circumstances, we will use the terms interchangeably within this opinion.

3. The facts underlying Appellee's conviction were set forth in this Court's opinion on direct appeal. *See Commonwealth v. Hackett*, 534 Pa. 210, 627 A.2d 719 (1993).

in July 1986, Appellee threatened to throw Ogrod out of his own home if he did not "cool out." Several days later, Appellee moved all of Ogrod's belongings from his bedroom to the basement without his permission. In contrast, Spence wanted Ogrod killed as a result of a drug-related dispute. Once Appellee and Spence discovered their shared hatred for Ogrod, they worked together to bring their plan to have Ogrod killed to fruition.

Appellee initially sought to hire an assassin to murder Ogrod. Appellee first contacted Edgar Torres to find a hitman "to bump someone off for money." When Torres asserted this task would cost him considerable money, Appellee assured Torres he would pay. Appellee subsequently gave Torres photographs of the victims and met with alleged assassins. Eventually, Torres told Appellee he could not find an individual for the job and refused to participate in Appellee's plan. Appellee and Spence offered another potential hitman named David Carter $5,000 to kill Ogrod and Dunne. While Carter initially agreed to this plan, Appellee and Spence's contract with Carter fell through as the men could not agree on the manner in which Carter would kill the victims.

At trial, several witnesses connected Appellee to the attack on Ogrod and Dunne, which occurred at 4:00 a.m. on July 31, 1986. Jeffrey Horoschak stated that when he called Ogrod's home at 1:45 a.m. that morning, Appellee told him Ogrod was asleep. Edward May testified that at 3:30 a.m., he gave a ride to Spence, Barrett, and Gray to a location near Ogrod's home, where the men met with a fourth individual who resembled Appellee and drove a truck similar to the one Appellee owned. Appellee's girlfriend, Wendy Rosenblum, testified that, at 5:00 a.m., Appellee called to tell her Ogrod was dead and came to her apartment through the basement, visibly shaking and sweating.

Appellee's subsequent conduct suggested he had facilitated the attack. Rosenblum claimed Appellee asked her to tell police he had been at her apartment all night and ordered her to obtain and destroy the photographs of the victims he had given to Torres to identify the individuals he wanted killed.

Rosenblum stated that, a week after the murders occurred, she saw Appellee take a crowbar out of the basement of her apartment, conceal it in his pants, and throw it in a nearby dumpster.

At the conclusion of the trial, the jury convicted Appellee of murder, conspiracy, aggravated assault, and possession of an instrument of crime. At the penalty hearing, the jury found two aggravating circumstances as Appellee conspired to pay another person to kill the victims and created a grave risk to Ogrod during the attack. *See* 42 Pa.C.S. § 9711(d)(2),(5). Finding no mitigating circumstances, the jury sentenced Appellee to death on July 17, 1988, which this Court affirmed on June 30, 1993. *Commonwealth v. Hackett*, 534 Pa. 210, 226, 627 A.2d 719, 727 (1993). Appellee filed a PCRA petition on January 14, 1997. After the PCRA court denied the petition, this Court affirmed, and the United States Supreme Court denied *certiorari*. *Commonwealth v. Hackett*, 558 Pa. 78, 735 A.2d 688 (1999); *Hackett v. Pennsylvania*, 528 U.S. 1163, 120 S.Ct. 1178, 145 L.Ed.2d 1086 (2000).

Appellee subsequently filed a *habeas corpus* petition in federal court.[4] While this petition was pending, Appellee filed his second PCRA petition, seeking relief from his execution pursuant to *Atkins*, in which U.S. Supreme Court concluded that the execution of intellectually disabled individuals constitutes cruel and unusual punishment under the Eighth Amendment.[5] The PCRA Court dismissed Appellee's petition as it felt it could not resolve Appellee's claims while his federal *habeas* petition was pending. This Court reversed the PCRA court's decision and remanded for further proceedings pursu-

4. The federal district court granted Appellee's request for a new penalty hearing pursuant to *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). *Hackett v. Price*, 212 F.Supp.2d 382 (E.D.Pa. 2001). However, the Third Circuit reversed the grant of *habeas* relief and the U.S. Supreme Court denied *certiorari*. *Hackett v. Price*, 381 F.3d 281 (3rd Cir.2004), *cert. denied, Hackett v. Folino*, 544 U.S. 1062, 125 S.Ct. 2514, 161 L.Ed.2d 1114 (2005).

5. We have jurisdiction over this claim pursuant to the PCRA timeliness exception set forth in 42 Pa.C.S. § 9545(b)(1)(iii) as Appellee's instant petition was filed within sixty days of the U.S. Supreme Court's decision in *Atkins*, which was filed on June 20, 2002.

ant to *Commonwealth v. Whitney*, 572 Pa. 468, 817 A.2d 473 (2003), in which this Court held a trial court has jurisdiction to address a PCRA petition during the pendency of a petitioner's federal *habeas* proceedings.

On May 3, 2004, Appellee filed a supplemental PCRA petition to raise a claim pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) after his co-defendant Spence was granted a new trial as a result of the prosecution's discrimination in jury selection. The PCRA judge, Willis Berry, Jr., granted relief on the *Batson* claim and dismissed the *Atkins* claim as premature. However, this Court reversed the PCRA court's decision as Appellee's *Batson* claim was untimely filed and remanded for further proceedings pursuant to *Atkins*. *Commonwealth v. Hackett*, 598 Pa. 350, 956 A.2d 978 (2008).

Upon remand, Judge Berry held several hearings on Appellee's *Atkins* claim from May to November 2011. The first witness Appellee chose to call was Ms. Judy Pezola, who taught Appellee at the Ashbourne School for children with special needs in her first year of teaching in 1974 after being certified in special education. Remembering back thirty years, Ms. Pezola recalled that ten-year-old Appellee worked at a first or second grade level and "needed structure and individualized attention to stay focused on his assignments and to work independently." As Appellee was labeled "brain injured," Ms. Pezola claimed "as far as [she] knew, kids who were labeled brain injured were educably mentally retarded." N.T., *Atkins* Hearing, 5/11/11, at 9–10, 15, 22; Pezola Aff. at 1–2.

On cross-examination, Ms. Pezola admitted Appellee was not labeled mentally retarded and conceded she was "not an expert" when asked to define the terms "brain-injured" and "mentally retarded." Although Ms. Pezola maintained all her students were mentally retarded, she agreed the Ashbourne School accepted children with learning disabilities and emotional issues. When confronted with a report in which she indicated Appellee was "very capable of attending to a task until completion" and "able to structure his time well when

working independently," Ms. Pezola claimed she wrote reports in a positive light. In other reports, she stated Appellee "takes great pride in helping other children read" and "acquires new math concepts easily if he's provided with the opportunity to practice and review the material." When asked about developmental delays Appellee claimed to have, Ms. Pezola denied Appellee had issues tying his shoes or going to the bathroom. N.T., *Atkins* Hearing, 5/11/11, at 22–24, 29–30, 32, 35–36, 42.

Next, Appellee presented the testimony of four mental health experts. Appellee's first expert, Dr. Barry Crown, a neuropsychologist practicing clinical and forensic psychology, opined that Appellee fits within the category of "mild mental retardation." Dr. Crown gave the Wexler adult intelligence scale to Appellee in 2009 after this Court remanded the case for an *Atkins* hearing more than seven years after Appellee filed his petition. Recognizing individuals with mild mental retardation typically have scores between 50 and 70, Dr. Crown reported Appellee's I.Q. score to be 57. Dr. Crown admitted this score was significantly lower than Appellee's previous I.Q. scores; Appellee received an I.Q. score of 80 in 1972 (age 8), a score of 85 in 1979 (age 15), and a score of 82 in 1988 (age 23). N.T., *Atkins* Hearing, 45–46, 52–54, 59, 80–84.

Despite the dramatic drop in I.Q. score, Dr. Crown felt the test he used to evaluate Appellee's *Atkins* claim was a true measure of Appellee's I.Q. and insisted "[t]here was nothing to suggest [Appellee] was attempting to fake this." Dr. Crown believed Appellee did not manipulate his score because the subscale scores displayed homogeneity and Appellee was forthright in his interview. In contrast, Dr. Crown attempted to discredit Appellee's prior scores as "not necessarily as reliable." Dr. Crown criticized the use of the Beta–2 test given to Appellee in prison in 1988, as the test was developed by the army in World War I to approximate I.Q. to screen for "illiterate recruits." Dr. Crown claimed the reliability of Appellee's 1979 score on the Wechsler Intelligence Test for Children—Revised (WISC–R) and his 1972 score on a test given by CORA Services could not be assessed without raw

data or supporting information on the tests' administration. Although Dr. Crown observed the WISC–R report was signed by one individual with a Ph.D. and another with a master's degree, he felt it was unclear who gave the test. Moreover, as this test was stamped "obsolete" for unknown reasons, Dr. Crown opined that perhaps this test would have to be repeated to account for developmental changes. N.T., *Atkins* Hearing, 5/11/11, at 46, 53–54, 59, 64, 80–84.

Although he did not personally evaluate Appellee, Dr. Crown found Appellee had adaptive limitations based on the reports of Appellee's other experts, affidavits from Appellee's family members, the affidavit of Appellee's trial counsel, Atty. Thomas Bergstrom, and the fact that Appellee repeated the first grade three times before enrolled in the Ashbourne School. Dr. Crown relied on the report of Dr. Jethro Toomer, who administered the SIB–R scale which measures adaptive functioning, but did not score this test or testify at trial. Dr. Crown cited to the affidavit of trial expert Albert Levitt who found Appellee functioned at a nine or ten year old level based on a test in which he required Appellee to draw a house, a tree, and a person. As Dr. Levitt felt Appellee's drawing could be produced by an eight to ten year old child, he opined that his maturity level was consistent with a child of the same age. N.T., *Atkins* Hearings, 5/11/11, at 65–73; 11/17/11, at 84–86, 205–208.

On cross-examination, Dr. Crown admitted Appellee's first three I.Q. scores were consistent and significantly different than his recent score, but asserted it was mere speculation that this discrepancy was caused by lack of motivation on the recent test. The prosecutor also compared the tests Dr. Crown and Dr. Armstrong administered and noticed Appellee incorrectly answered word problems involving subtraction of single digit numbers but somehow was able to correctly multiply 809 by 47. Dr. Crown found these questions test different skills as word problems involve abstract processing whereas arithmetic does not. N.T., *Atkins* Hearing, 5/11/11, at 105–107, 123, 177, 185–88.

Admitting his finding that Appellee has adaptive functioning deficits is largely based on affidavits of family members, Dr. Crown expressed no reservation about taking these statements at face value. The prosecutor asked if Dr. Crown had considered that Appellee ran his own business, paid off loans on two trucks, purchased a boat, was the part owner of a beach house, plotted a murder, and sent handwritten grievances to prison officials. Dr. Crown felt Appellee's family helped him run his business, could not confirm Appellee wrote the grievances, and was not persuaded Appellee showed direction in planning the murder.

In a further attempt to cast doubt on Dr. Crown's opinion, the prosecutor presented two of Appellee's recorded phone conversations from prison. In the first, Appellee explained to his mother the concept of short-selling on the stock market and claimed he had used this technique in the past. Dr. Crown felt Appellee's intellectual disability did not prevent him from engaging in financial transactions. In the second, Appellee informed his sister his lawyers told him to not to go to the law library, talk to other inmates, or make mistakes "Joey Miller" did on death row when he talked about how he was "beatin [sic] the system and . . . playing the nut role." This information did not change Dr. Crown's opinion that Appellee was being forthright and was motivated to do well on his I.Q. test. Dr. Crown asserted he did not know what Appellee meant by this statement but felt Appellee was "dumb enough to be having such conversations on a monitored phone." N.T., *Atkins* Hearing, 5/11/11, at 165–66, 171, 175.

Appellee's next expert, Dr. Daniel Martell, a forensic neuropsychologist, testified as an expert for the prosecution in *Atkins* and for the defense in *Miller.* Dr. Martell showed concern about the disparity in Appellee's I.Q. scores, but felt the test administered by Dr. Crown was reliable as it was scored correctly and the Mittenberg Index for malingering, which was applied to the score pattern, reported Appellee was being honest. Dr. Martell questioned the validity of Appellee's 1988 Beta–2 test results, as he observed the test was incorrectly scored as Appellee's score should have been 74 and

further claimed this test should not be used to assess intellectual disability. However, Dr. Martell disagreed with Dr. Crown's evaluation of Appellee's first two scores, which Dr. Martell found could be legitimate. N.T., *Atkins* Hearing, 5/12/11, at 16–19.

Although Dr. Martell agreed Appellee had an average I.Q. in his adolescence, Dr. Martell attributed the significant drop in his I.Q. to recreational boxing and exposure to toxins. Noting Appellee's participation in a boxing program from age 14 to 15, Dr. Martell discussed the possible effects of dementia pugilistica ("boxer's brain") and compared Appellee to Mohammed Ali. Dr. Martell also noted Appellee was exposed to chemicals without protective clothing when he used the pesticide malathion in his landscaping business and worked at his parents' kennel where he coated the puppies' cages with creosote and applied Sevin to kill parasites. N.T., *Atkins* Hearing, 5/12/11, at 20–24.

Looking to Appellee's adaptive functioning, Dr. Martell claimed Appellee had deficits in five areas: functional academics, self-direction, social and interpersonal skills, self-care, and safety. With regard to academics, Dr. Martell emphasized Appellee repeated the first grade three times in the public school system. Appellee's records from the Ashbourne School, where Appellee was labeled "brain injured," showed he was behind grade level; one report stated Appellee functioned at a sixth grade reading level and a fourth or fifth grade math level at age sixteen. With respect to self-direction, Dr. Martell relied on reports describing Appellee as vulnerable to manipulation and requiring structure and attention to stay on task. With respect to socialization, Dr. Martell pointed to allegations that Appellee had trouble making friends. With respect to self-care, Dr. Martell cited affidavits of family members claiming Appellee wet himself until he was eleven and had trouble tying his shoes. With respect to safety, Dr. Martell recalled family members related the following stories: Appellee held a firework until it blew up, had an accident with a chemistry kit as a child, and injured himself climbing a tree with a chainsaw while intoxicated. Dr. Martell admitted

Appellee was able to run a landscaping business that did not require a high level of functioning as his mother claimed to have done the bookkeeping. Dr. Martell's opinion was not affected after hearing Appellee discussing short-selling stocks as Dr. Martell claimed Appellee's intellectual disability causes him to compensate for his mental deficits by trying to appear more competent than he actually is. Moreover, Dr. Martell found Appellee showed poor judgment in talking on the phone about how his lawyers advised him not to use to the prison phone system which records calls. N.T., *Atkins* Hearing, 5/12/11, at 11–13, 38–42.

On cross-examination, Dr. Martell conceded his theory connecting Appellee's drop in I.Q. to boxing and chemical exposure information was based on Dr. Armstrong's report and his subsequent interview with Appellee's mother a week before trial. Dr. Martell had no specific information about Appellee's boxing program, conceded he did not know if Appellee wore safety gear, and shared Appellee's mother was not aware of an occasion where Appellee was injured or knocked out. Additionally, Dr. Martell claimed the government has banned the use of chemicals Appellee used (malathion, Sevin, and creosote) as such chemicals cause nervous system damage. When discussing Dr. Martell's reliance on the Mittenberg index in finding Appellee had not purposefully manipulated his score, the prosecutor questioned whether this index accounts for lack of motivation. Dr. Martell admitted Appellee had a motive not to do well. N.T., *Atkins* Hearing, 5/12/11, at 61, 66–68, 71–74, 95–99.

Dr. Martell conceded Appellee was never deemed mentally retarded in his youth but found to be "brain-injured," a term which did not necessarily mean an injury but could have referred to a learning disability. Although some of Appellee's school records indicated he did not have social skills and was a follower who was easily manipulated, the prosecutor presented other reports which indicated Appellee's "outgoing and friendly personality makes him well liked by his peers" and noted "occasionally [Appellee would] manipulate less mature members of the class." Admitting he had "missed" these reports

and became "confused" with which records he reviewed, Dr. Martell stated the only records he considered were in Appellee's pleadings. Dr. Martell admitted this information did alter the findings in his report but did not change his opinion. N.T., *Atkins* Hearing, 5/12/11, at 76, 104–109.

The prosecutor also attacked Dr. Martell's finding that Appellee showed deficits in adaptive functioning as Dr. Martell had never met Appellee but based his report on portions of school records and affidavits from his family. Although Appellee's family indicated Appellee wet himself and could not tie his shoes in grade school, Dr. Martell admitted none of Appellee's school reports refer to such problems and Ms. Pezola denied Appellee had these issues. Dr. Martell found Appellee had deficits in safety was based on the following reports of family members: Appellee jumped into a waterfall of unknown size, held an exploding firecracker without any documented injuries or subsequent problems using his hands, and had an accident while drunk. Even though Appellee was able to live on his own, run a business, take out truck loans, and buy a beach home, Dr. Martell found Appellee had deficits in self-care. However, Dr. Martell conceded Appellee's adaptive functioning improved over time and was on a divergent course with Dr. Crown's I.Q. results. N.T., *Atkins* Hearing, 5/12/11, at 114–40.

Appellee's third expert, Dr. John O'Brien, who is both a psychiatrist and a lawyer, opined that Appellee is "mentally retarded," but frankly admitted he authored his report without reviewing Appellee's first three I.Q. scores. However, Dr. O'Brien averred this information did not change his opinion because the Beta test does not properly test for intellectual disability and Appellee's first two scores cannot be validated without raw data. Dr. O'Brien gave Appellee cognitive capacity screening tests which showed Appellee has impaired memory and calculation. Further, Dr. O'Brien felt Appellee has anxiety regarding his cognitive limitations which affects his functioning levels. Dr. O'Brien indicated that in his interview with Appellee, he sensed Appellee was trying to impress him with his knowledge and capabilities. On cross-examination,

Dr. O'Brien admitted Appellee's first three I.Q. results were consistent, but repeated he could not assess the reliability of Appellee's 1972 and 1979 tests without the raw data. Nevertheless, Dr. O'Brien conceded he relied on Dr. Crown and Dr. Armstrong's tests without reviewing their raw data. N.T., *Atkins* Hearing, 5/12/11, at 178–84, 187–192, 218–19, 226–230.

Appellee's last expert witness, Dr. Carol L. Armstrong, the director of the University of Pennsylvania neuropsychology laboratory, testified for the defense in the *Miller* case. Her evaluation of Appellee in 2010 consisted of forty-five tests that explored cognitive memory processes. As only two of these tests were relevant to I.Q., Dr. Armstrong explained the goal of her testing was to break down Appellee's composite I.Q. score to discover underlying problems. Describing Appellee as having a severe profile of neuropsychological impairment, Dr. Armstrong noted Appellee has intellectual disability marked by deficits in verbal and visual memory, facial perception, arithmetic, and information processing. Dr. Armstrong opined that Appellee has a poor ability to plan his behavior based on his errors on a maze drawing task and found no evidence Appellee was malingering on these tests. Concluding that Appellee exhibits neuropsychological impairment and "mental retardation," Dr. Armstrong asserted her findings were supported by his familial pattern of abnormal neurological development, his poor educational adaptation, and "insults" he experienced in adolescence while boxing and working with chemicals. Dr. Armstrong found Appellee's intellectual disability began prior to age eighteen based on his developmental delay and Mrs. Pezola's claim that Appellee was "mentally retarded." N.T., *Atkins* Hearing, 11/15/11, at 84, 90–97, 100–108, 113–115.

Agreeing that most individuals with mild mental retardation can live independently, Dr. Armstrong claimed Appellee's intellectual disability did not prevent him from running a business. While Dr. Armstrong admitted Appellee had a high school level vocabulary and filed prison grievances in which he demonstrated correct word usage and grammar, Dr. Armstrong asserted that intellectual disability does not cause an

individual to lose his ability to write and speak correctly. Dr. Armstrong's opinion was not affected when she learned Appellee discussed short-selling stocks, as there "was no way to test the effectiveness ... [or] accuracy of what was being said." N.T., *Atkins* Hearing, 11/15/11, at 128–44.

Dr. Armstrong criticized two aspects of the Commonwealth's expert report, in which Dr. Paul Spangler pointed to disparities in Appellee's performance on similar portions of tests given by Dr. Crown and Dr. Armstrong. Specifically, Dr. Armstrong admitted Appellee performed better on her similarities test after Dr. Crown had administered the same exam, but claimed this was caused by the "practice effect" where Appellee would improve on questions he has seen on a prior occasion. Dr. Armstrong also attacked the Commonwealth's point that Appellee answered more difficult questions on her arithmetic test. Dr. Crown claimed this criticism did not change her conclusion because these tests were not "equivalent"; while Appellee did poorly on word problems that required mental concentration and working memory, he was able to correctly answer basic arithmetic problems. N.T., *Atkins* Hearing, 11/15/11, at 138–42.

On cross-examination, Dr. Armstrong acknowledged the tests she administered did not measure I.Q. or assess Appellee's adaptive functioning. While Dr. Armstrong found Appellee's performance was consistent with "mental retardation," she admitted that it was also consistent with other brain abnormalities. Dr. Armstrong reiterated the goal of her testing was to validate Appellee's I.Q. and his recent classification as intellectually disabled. After the prosecutor questioned this statement, Dr. Armstrong agreed Appellee had never been previously diagnosed with mental retardation and noted she relied on the observation of Appellee's teacher, Ms. Pezola, who Dr. Armstrong admitted had limited teaching experience and did not know the difference between the terms "brain injured" and "mentally retarded." N.T., *Atkins* Hearing, 11/15/11, at 150–57.

When the prosecutor noted the discrepancy between Appellee's I.Q. test scores obtained before and after he filed his

*Atkins* petition, Dr. Armstrong asserted that it is necessary to evaluate Appellee's pre-*Atkins* test scores in the context of the "Flynn effect," the theory that I.Q. scores on tests with outdated norms may be inflated due to the general rise of the I.Q. scores of a population over time. Although Dr. Armstrong had not discussed the Flynn effect in her report or on direct examination, she asserted Appellee's pre-*Atkins* scores should have been adjusted for the Flynn effect. Nevertheless, Dr. Armstrong admitted that, even with this adjustment, Appellee's scores were above the range of intellectual disability. While Dr. Armstrong claimed Appellee's exposure to chemicals may have caused brain injury and suggested there are scientific studies exploring the effect of the chemicals Appellee used on the neurological system, Dr. Armstrong admitted these chemicals are commercially available and malathion is used to treat head lice in children. N.T., *Atkins* Hearing, 11/15/11, at 181–84, 212–15.

The prosecutor attacked Dr. Armstrong's finding that Appellee lacked control of impulsivity based on his failure to complete a maze drawing test without errors. In determining Appellee lacked planning skills, Dr. Armstrong stated she did not find it necessary to consider the facts underlying Appellee's murder conviction because she did not "think these were equally convertible concepts." Similarly, although Dr. Armstrong admitted she had no information on how Appellee planned and organized his landscaping business, she asserted this information was not important in deciding whether Appellee had planning impairment. Dr. Armstrong claimed it was improper to rely on the representations of individuals rather than an objective neuropsychological test. N.T., *Atkins* Hearing, 11/15/11, 180, 202, 220–21.

Appellee also called his trial counsel, Atty. Thomas Bergstrom, to testify. Atty. Bergstrom claimed Appellee was the "most mentally challenged client [he] ever had" because Appellee was slow in understanding legal concepts. Atty. Bergstrom remembered Appellee played a limited role in his trial and gave no feedback. On cross-examination, Atty. Bergstrom admitted he did not challenge Appellee's competency to

stand trial because he was satisfied Appellee understood the basics of the trial process. Although Atty. Bergstrom vaguely remembered some of the details concerning Appellee's crimes, Atty. Bergstrom admitted he was not familiar with this history as he had not read the trial transcript for twenty-five years. When confronted with a phone conversation Appellee had with his sister while in prison in which Appellee explained Mumia Abdul Jamal's legal position in his own capital murder case, Atty. Bergstrom felt this was not strange as Appellee had twenty-five years on death row to learn the facts of that case. N.T., *Atkins* Hearing, 5/13/11, at 43, 56, 65.

Furthermore, Appellee's family testified on his behalf. Appellee's paternal aunt, Geraldine Culp, and his maternal aunt, Geraldine Krause, gave similar testimony that Appellee developed slower than their children in reading, tying his shoes, and dressing himself. Both Ms. Culp and Ms. Krause testified Appellee would spend time with younger children. Mrs. Culp believed Appellee wet himself until he was ten and claimed Appellee's mother went to his school when he had an accident. On cross-examination, Ms. Culp was surprised to learn Appellee's school records contained no indication he had trouble going to the bathroom and his teachers documented that Appellee had no fine motor skills problems, was very competitive in school athletics, and was somewhat of a bully. Ms. Krause claimed Appellee had difficulty playing games as he did not understand them and would lose attention quickly. She reported four incidents involving Appellee's judgment as a child: Appellee rode his bike into a creek, accidentally discolored the floor of her home with a chemistry set, knocked down a tent, and on one occasion, did not respond when she yelled for him to get his mother. When the prosecutor asked whether it was abnormal for a twelve-year-old to ride a bike into a creek, Ms. Krause responded that her daughter "was the same age as [Appellee] and she never did anything like that." N.T., *Atkins* Hearing, 5/13/11, at 7, 9, 13–15, 21–23, 78, 81–88, 98.

Appellee also relied on the testimony of his mother, Bonnie Hackett. Mrs. Hackett confirmed that she enrolled Appellee

in the Ashbourne School after he repeated the first grade three times and indicated Appellee had problems tying his shoes, focusing on tasks such as cooking or doing laundry, and wearing appropriate clothing for each season. Although Appellee ran his business, Mrs. Hackett claimed Appellee's father got him business cards and helped him obtain tools and a truck while Mrs. Hackett kept the finances, made the truck payments, set the prices, and sent invoices. Mrs. Hackett shared that Appellee's brother was diagnosed as "mentally retarded" and his late father had limitations in intellectual functioning. N.T., *Atkins* hearing, 11/15/11, at 6–7, 25–26.

At several points in her testimony, defense counsel found it necessary to redirect Mrs. Hackett after she discussed Appellee's participation in boxing and his exposure to chemicals when she had not been asked questions related to these topics. Mrs. Hackett asserted she did not want Appellee to join the boxing club as she was worried he would be injured; she related one occasion in which Appellee's ear and eye were swollen and other occasions in which Appellee went to bed at 6:00 p.m. As such, Mrs. Hackett was thankful his participation in boxing did not "last . . . too long." In addition, Mrs. Hackett expressed concern about Appellee's exposure at the family kennel to creosote, which Appellee would apply to the puppies' cages without a mask or gloves. Mrs. Hackett claimed Appellee used malathion at work without similar precautions. Mrs. Hackett asserted both chemicals were taken off the market and asserted creosote is carcinogenic. N.T., *Atkins* hearing, 11/15/11, at 10–11, 15–23.

On cross-examination, Mrs. Hackett testified that Appellee was never diagnosed with "mental retardation" but found to have learning disabilities in his youth. While Mrs. Hackett focused on Appellee's delay as a child in learning to tie his shoes and dress himself, she agreed these problems did not exist when Appellee was eighteen. Although she expressed concern about Appellee's possible brain damage from boxing and exposure to chemicals in his adolescence, Mrs. Hackett admitted she did not allege these facts in her affidavit and was not aware that creosote is, in fact, available for purchase and

used commercially. N.T., *Atkins* hearing, 11/15/11, at 29, 33–38, 45–50.

Describing Appellee as a hard worker, Mrs. Hackett testified that Appellee's business was successful enough to allow Appellee to purchase two trucks by the time he was eighteen years old. Mrs. Hackett agreed Appellee was responsible for scheduling the jobs his employees would complete each day, which included lawn mowing, spraying, and general lawn maintenance. Mrs. Hackett testified she had hoped Appellee could care for himself when she moved to Monroe County in 1985 and Appellee remained in Philadelphia. She claimed Appellee then hired a woman named Heidi Guhl to handle the business finances. As Mrs. Hackett claimed Appellee could not handle financial matters, the prosecutor asked her if she remembered testifying in 1988 that Appellee rented an office for his business because "he needed a place that was quiet, that he had access to, to make out bills and whatnot." Mrs. Hackett did not deny making this statement, but asserted Appellee organized the documents so that she could do his bookkeeping. When asked if Appellee reported income from the stock market, Mrs. Hackett explained Appellee did not take interest in stocks until she had discussed this topic with him while he was incarcerated as a way to make conversation. N.T., *Atkins* hearing, 11/15/11, at 29, 36–40, 45–50, 61–63, 67–68.

The Commonwealth presented the expert testimony of psychologist Dr. Paul Spangler, the president of the mid-Atlantic region of the American Association of Intellectual and Developmental Disabilities (AAIDD), who found no evidence Appellee was "mentally retarded." Dr. Spangler's clinical experience includes employment in the 1970's as assistant director of the Elwyn Institute, a facility for individuals with developmental disabilities. In this position, Dr. Spangler had contact with the Ashbourne School which Appellee attended during this period. Dr. Spangler asserted the Ashbourne School did not seek to enroll students with "mental retardation," but specialized in educating children with minimal brain dysfunction,

which Dr. Spangler correlated to learning disabilities. N.T., *Atkins* hearing, 11/17/11, at 8–13, 91, 115.

Dr. Spangler found no reason to discredit the I.Q. scores recorded by the Ashbourne School in 1972 and CORA Services in 1979, as these institutions were respectable sources of information which he had relied on during his career. Dr. Spangler agreed that the Beta–2 test, which the defense felt did not adequately assess intellectual disability, should not be relied on as the sole measure of I.Q., but advocated its use as a screening tool. Even after recognizing the Beta–2 test's weaknesses, Dr. Spangler noted Appellee's score was consistent with his prior two test results, which Dr. Spangler found no reason to discredit. N.T., *Atkins* hearing, 11/17/11, at 23–24, 44, 65.

Dr. Spangler criticized the defense's reliance on the I.Q. test Dr. Crown gave Appellee in 2009 to evaluate his *Atkins* claim and found the drop of approximately twenty points in I.Q. was significant. As I.Q. tests are subject to time restraints, Dr. Spangler explained that a person's lack of motivation or effort can lower their I.Q. score. Although Dr. Spangler did not believe Appellee was lying *per se* on this test, Dr. Spangler felt he was not motivated to do well or perform quickly on a test that results in a death sentence. Dr. Spangler observed Appellee did "noticeably poor[ly]" on timed questions and noted disparity in the speed with which he completed similar sections of I.Q. tests administered before and after he filed his *Atkins* claim. Dr. Spangler also noted Appellee did better on tests given by Dr. Armstrong, who was not seeking to measure I.Q. As such, Dr. Spangler questioned the applicability of the Mittenberg index, which is designed to measure purposeful falsification. Dr. Spangler found it "cruel" to give an I.Q. test to a death row inmate and ask him to perform to the best of his ability in hopes he will do well enough to be executed. N.T., *Atkins* hearing, 11/17/11, at 24–30, 36–48, 52–57, 66, 79.

While Dr. Spangler did not challenge the validity of Dr. Armstrong's evaluation, he asserted that such tests are not used to diagnose intellectual disability and do not produce an I.Q. score. Dr. Spangler noted that none of Appellee's subs-

cale scores related to I.Q. were below the second percentile, which defines intellectual disability. He highlighted Appellee's score in the 75th percentile on the abstract verbal reasoning subtest, which he correlated with an I.Q. of 115, and further indicated Appellee answered sophisticated questions which only people with I.Q.'s in excess of 130 are expected to get correct. Dr. Armstrong rejected the claim that the "practice effect" accounted for Appellee's better performance on Dr. Armstrong's similarities test as she gave him additional questions he had not seen on Dr. Crown's test. Moreover, Dr. Spangler found it improper to attribute the drop in Appellee's I.Q. score to exposure to creosote, Sevin, malathion and Roundup as he was unaware of any scientific articles connecting these chemicals to brain damage. Dr. Spangler also felt there was no evidence Appellee's limited recreational boxing as a fourteen-year old caused any brain damage as Appellee's obtained his highest I.Q. score at age fifteen. N.T., *Atkins* hearing, 11/17/11, at 50–59, 74–78, 80, 99–101.

With respect to Appellee's adaptive functioning, Dr. Spangler found school records indicated Appellee was progressing normally and contained no reference to problems with skill acquisition or communication. One report described seventeen-year-old Appellee with this phrase: "[d]evelopmental history showed no unusual events and a normal progression in acquisition of skills." Dr. Spangler noted the defense experts did not give Appellee adaptive functioning tests, but relied on family anecdotes, which Dr. Spangler felt should not be accepted at face value. Dr. Spangler questioned Dr. Crown's reliance on Dr. Toomer's adaptive functioning test, which was incorrectly given and never scored. He also found it improper for Appellee to rely on the "grossly fallacious" claim of expert Albert Levitt who found Appellee functioned at a ten year old level based on his drawing of a tree. N.T., *Atkins* hearing, 11/17/11, at 83–85, 91–95, 99–101, 208–209, 221.

Dr. Spangler felt Appellee's ability to run his own business and discuss the stock market was advanced and consistent with normal behavior, not intellectual disability. Dismissing the defense's assertion that Appellee talked about stock trad-

ing to appear intelligent, Dr. Spangler felt Appellee did not merely mimic other individuals or repeat information, but showed sophisticated cognitive skills as seen in his ability to write prison grievances with correct grammar and sentence structure. Although he admitted individuals with intellectual disability can learn to use mechanical equipment, Dr. Spangler felt such individuals are not often left to operate machinery independently and do not usually run businesses where they are responsible for handling money and keeping track of appointments. Further, Dr. Spangler felt Appellee's crime was not typical of offenses committed by intellectually disabled individuals, which are generally impulsive and show "very little aforethought." N.T., *Atkins* hearing, 11/17/11, at 85–88, 105–109, 211.

On cross-examination, Dr. Spangler admitted he did not personally evaluate Appellee, but explained that he found no reliable source of evidence of "mental retardation" prior to Appellee's eighteenth birthday and claimed testing would be irrelevant to assess whether Appellee was "mentally retarded" thirty years ago. Further, Dr. Spangler wished to avoid a false evaluation as he did not feel Appellee would give him a fair response when taking an I.Q. test under the duress of the death penalty. Similarly, Dr. Spangler did not recommend utilizing the Mittenberg index as he questioned its accuracy, but felt Appellee did not show significant signs of purposeful manipulation. While Dr. Spangler emphasized the discrepancy in Appellee's performance on similarities tests given by Dr. Crown and Dr. Armstrong, he conceded Appellee performed similarly on their vocabulary and information tests. N.T., *Atkins* hearing, 11/17/11, at 136–139, 143–45, 153.

While Appellee was behind grade level every year, Dr. Spangler acknowledged Appellee may have learning disabilities, not "mental retardation," as Appellee's learning advanced at a normal rate after enrolled at the Ashbourne School. With respect to Appellee's adaptive functioning, Dr. Spangler conceded that he did not address in his report Dr. Martell's findings that Appellee had limitations in the area of self-care, self-direction, social interpersonal skills, safety, and functional

academics, but felt Appellee had no deficits in those areas. Dr. Spangler confined his evaluation to the tests given and their accuracy. N.T., *Atkins* hearing, 11/17/11, at 119–20, 158–161.

The Commonwealth elicited the testimony of Heidi Guhl, Appellee's employee who answered his office phone on Saturdays. Ms. Guhl claimed Appellee scheduled his workers, prepared estimates, and operated all of his equipment. Ms. Guhl remembered Appellee did not write checks and paid his employees cash. Although Appellee's family claimed she did the bookkeeping after his mother moved to Monroe County, Ms. Guhl denied these allegations. Ms. Guhl partied at Appellee's beach house because Appellee would buy her alcohol as she was underage at the time. When Appellee was on work release for several burglary convictions, Ms. Guhl claimed that Appellee deceived authorities into allowing him to go to the shore on the weekends as he had maintained he had contracts there. Ms. Guhl admitted she had been charged with possession of drug paraphernalia but denied receiving preferential treatment from the Commonwealth. Although Ms. Guhl had a close relationship with the victims and expressed hate for the act Appellee committed, she claimed to have no ill feelings against him. As Ms. Guhl felt Appellee's crime was an immature mistake, she was not opposed to the trial court vacating his death sentence. Ms. Guhl did not believe Appellee had intellectual difficulties, but suggested he had anger issues. N.T., *Atkins* hearing, 11/16/11, at 6, 10, 12–23, 41–49.

After hearing this testimony, the PCRA court determined Appellee's 2009 I.Q. score of 57 placed him in the range of "mild mental retardation" and was satisfied Appellee was not malingering on this test. Finding Appellee's pre-*Atkins* scores to be "unreliable," the PCRA court indicated Dr. Spangler "could not specifically vouch for the veracity or accuracy of these earlier tests" and had not performed his own testing. In addition, the PCRA court found Appellee had deficits in adaptive functioning as seen in his need to repeat the first grade three times, his developmental delay, anecdotes of Appellee's unsafe behavior, and school reports indicating

that he did not make friends easily, was easily manipulated, and required direction. In conjunction with Appellee's exposure to toxic chemicals, his "repeated head injuries," and familial history of limitations in intelligence, the PCRA court found Appellee had proven his intellectual disability by a preponderance of the evidence under the standard set forth in *Miller*. PCRA Op., 6/8/12, at 6, 7–16, 19.

The Commonwealth appealed, claiming Appellee has not met his burden under *Miller* and asks this Court to "adopt a more objective legal definition of mental retardation to combat fraud upon the courts." Commonwealth's Brief, at 3. In reviewing a PCRA court's determination of whether a petitioner is intellectually disabled and thus, exempt from the death penalty, our standard of review is as follows:

A question involving whether a petitioner fits the definition of mental retardation is fact intensive as it will primarily be based upon the testimony of experts and involve multiple credibility determinations. Accordingly, our standard of review is whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous. We choose this highly deferential standard because the court that finds the facts will know them better than the reviewing court will, and so its application of the law to the facts is likely to be more accurate.

*Commonwealth v. Williams*, 619 Pa. 219, 223, 61 A.3d 979, 981 (2013) (citing *Commonwealth v. Crawley*, 592 Pa. 222, 228–29, 924 A.2d 612, 616 (2007)).

## II. ANALYSIS

### A. Review of PCRA court's *Atkins* determination

Before we examine each party's claims in further detail, it is necessary to set forth relevant precedent to give context to their arguments. After the U.S. Supreme Court issued its pronouncement in *Atkins* prohibiting the execution of "mentally retarded" individuals, the High Court left to the individual states the responsibility of setting procedures to assess a

defendant's claim of intellectual disability. *Atkins,* 536 U.S. at 317, 122 S.Ct. at 2250, 153 L.Ed.2d 335 (stating "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences"). As our General Assembly has not enacted legislation to set such standards eleven years after *Atkins* was decided, this Court has exercised its constitutional power of judicial administration in the interim to set forth procedures to implement the *Atkins* decision in Pennsylvania. *Commonwealth v. Sanchez,* 614 Pa. 1, 48, 36 A.3d 24, 52 (2011); *cert. denied,* —— U.S. ——, 133 S.Ct. 122, 184 L.Ed.2d 58 (2012); *Miller,* 585 Pa. at 155, 888 A.2d at 631; Pa. Const. Art. V, § 10(c).

 In *Miller,* this Court established the prevailing standard for *Atkins* claims in Pennsylvania: a defendant must show, by a preponderance of the evidence, that he is "mentally retarded" under the definitions provided by the American Psychiatric Association (APA) or the American Association of Mental Retardation (AAMR), which was renamed the American Association on Intellectual and Developmental Difficulties (AAIDD). *Miller,* 585 Pa. at 155, 888 A.2d at 631. These clinical definitions are as follows:

> The AAMR defines mental retardation as a "disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in the conceptual, social, and practical adaptive skills." Mental Retardation[: Definition, Classifications, and Systems of Supports 1 (10th ed. 2002) (Mental Retardation) ] at 1. The American Psychiatric Association defines mental retardation as "significantly subaverage intellectual functioning (an I.Q. of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." [Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1992) (DSM–IV),] at 37. Thus, ... both definitions of mental retardation incorporate three concepts: 1) limited intellectual functioning; 2) significant adaptive limitations; and 3) age of onset.

*Id.* at 153, 888 A.2d at 629–30 (footnote omitted). In sum, a defendant may establish "mental retardation" under either the AAMR (AAIDD) or APA/DSM–IV definition by showing by a preponderance of the evidence that he has limited intellectual functioning, significant adaptive limitations, and the onset of his subaverage intellectual functioning began before he turned 18 years old. *Williams,* 619 Pa. at 224, 61 A.3d at 982.

The first prong of this test, significantly subaverage intellectual functioning, is signified through I.Q. scores which are approximately two standard deviations (or 30 points) below the mean score (100). *Miller,* 585 Pa. at 154, 888 A.2d at 630 (citing Mental Retardation, at 14; DSM–IV, at 39). It is important to note, however, that a low I.Q. score, by itself, is not sufficient to assess "mental retardation" under the DSM–IV and AAIDD definitions. *Miller,* 585 Pa. at 154, 888 A.2d at 630. The second prong of *Miller* test requires the individual to show significant deficits in adaptive functioning. *Id.* Adaptive behavior is defined as the "collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives"; individuals with adaptive behavior limitations struggle in adjusting to ordinary demands of life. *Id.* The AAIDD recommends adaptive behavior be assessed through standardized testing and defines significant limitations in adaptive behavior as performance that is at least two standard deviations below the mean of either in an overall score assessing conceptual, social, and practical skills or within any one of three categories individually. *Id.* at 154, 888 A.2d at 630–31. In contrast, the DSM–IV requires significant deficits in two of the following categories: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety. *Id.* at 154, 888 A.2d at 630 n. 8.

## 1. Arguments

Pursuant to these standards, the Commonwealth argues the PCRA court erred in determining that Appellee met his burden to prove that he is intellectually disabled and thus,

entitled to *Atkins* relief. The Commonwealth claims historical evidence established before Appellee raised his *Atkins* claim shows Appellee was not intellectually disabled. In contrast, the Commonwealth contends that Appellee presented speculative testimony from defense experts who conducted intelligence testing decades after Appellee's crimes for the purpose of proving Appellee's *Atkins* claim in an attempt to convince the PCRA court to vacate Appellee's death sentence.

With respect to the intellectual functioning prong of the *Miller* test, the Commonwealth asserted Appellee's claim that his I.Q. score is within the range of intellectual disability is false as a matter of law. Noting the threshold score for intellectual disability is 70, the Commonwealth claims the PCRA court erred in ignoring the results of Appellee's early I.Q. tests in which he scored of 82 at age 7, 85 at age 14, and 80 at age 22, which placed Appellee in the low-normal range and above the applicable threshold. Although some defense experts questioned the reliability of these tests, Appellee's own expert, Dr. Martell, admitted these scores were consistent and likely reliable.

Given the precision of his pre-*Atkins* test scores, the Commonwealth criticizes the PCRA court's reliance on the self-serving results of Appellee's 2009 I.Q. test, in which he scored a 57. Considering this score to be an outlier, the Commonwealth asserts there is a significant risk that intelligence testing administered for the purposes of *Atkins* litigation will be skewed and invalid as a defendant has a decreased motivation to perform well when good performance will lead to execution. To support this claim, the Commonwealth cites precedent of other state appellate courts who have recognized that it is necessary to examine a defendant's motivation when assessing intelligence testing given to assess *Atkins* claims. *See Arizona v. Grell,* 212 Ariz. 516, 135 P.3d 696, 702 (2006); *Bowling v. Kentucky,* 163 S.W.3d 361, 376 (Ky.2005); *Hughes v. Mississippi,* 892 So.2d 203, 215 (Miss.2004); *Louisiana v. Dunn,* 831 So.2d 862, 886 n. 9 (La.2002). Although defense expert Dr. Martell asserted the Mittenberg index indicated Appellee was not malingering, the Commonwealth points out

that Dr. Martell admitted Appellee had a motive not to do well on his post-*Atkins* I.Q. test. Further, the Commonwealth argues that the PCRA court erroneously relied on the "Flynn effect" to explain away Appellee's historical I.Q. results which it claims cannot account for the precipitous loss of twenty-seven I.Q. points after he filed his *Atkins* petition.

Turning to the adaptive functioning prong of the *Miller* test, the Commonwealth also contends the PCRA court improperly focused on delays in Appellee's development which he overcame well before he turned eighteen. After Appellee was enrolled at the Ashbourne School, which focused on children with learning disabilities, and not "mental retardation," Appellee's records showed improvement and progression although he was behind grade level. Citing to a portion of the DSM–IV manual which provides individuals with "mild mental retardation" can achieve academically to the sixth grade level, the Commonwealth points to tests indicating Appellee achieved beyond this benchmark.

In contrast, the Commonwealth questions the defense experts' refusal to consider Appellee's adaptive functioning at the time he conspired to commit murder: Appellee lived independently, ran a small business in which he scheduled and paid his employees, rented an office, and purchased and operated vehicles and sophisticated equipment. As Appellee's business was successful, he earned enough money to buy a boat and share ownership of a New Jersey beach home. Additionally, the Commonwealth points to Appellee's manipulation of the "loopholes of life," where Appellee lived at the Ogrod home and stored his business equipment there without paying any rent, used his business to target homes he later burglarized, and deceived authorities to believe he had contracts in New Jersey so that he could travel to the shore on weekends while on work release.

Moreover, the Commonwealth emphasizes that none of the defense experts successfully evaluated Appellee's alleged adaptive functioning limitations through standardizing testing; while Dr. Crown relied on Dr. Toomer's evaluation of Appellee's adaptive functioning, the defense did not challenge the

Commonwealth's assertion that Dr. Toomer's results were invalid as he administered the test incorrectly. Instead, the Commonwealth claims the PCRA court's finding that Appellee had adaptive functioning deficits is based on anecdotes of family members interested in helping Appellee avoid the death penalty and a selective reading of Appellee's school records that ignores evidence of Appellee's improvement, success, and capabilities.

The Commonwealth asserts that the PCRA court's conclusion that Appellee met the third prong of the *Miller* test and exhibited the onset of "mental retardation" prior to age eighteen is not supported by the record. As Appellee had never been diagnosed as intellectually disabled before he sought *Atkins* relief and his historical I.Q. results revealed Appellee scored in the low average range of the I.Q. spectrum, the Commonwealth characterizes the defense theories concerning Appellee's drop in I.Q. as speculative. Although defense experts claimed Appellee sustained brain injury from chemical exposure, the Commonwealth argues that none of the defense experts testified to any expertise in this area, cited to any scientific studies which found these specific chemicals to be toxic, or connected Appellee's exposure to his alleged intellectual disability. In addition, the Commonwealth challenges the internal consistency of the defense theories which assert Appellee's I.Q. dropped dramatically while his adaptive functioning improved over time. The Commonwealth also questions the defense experts' adamant refusal to acknowledge that Appellee's drop in I.Q. score could have been caused by his lack of motivation to perform well on a test that will be used to support his execution.

Further, the Commonwealth asserts that the PCRA judge failed to grasp that Appellee was required to prove he was "mentally retarded," and did not merely have mental impairment, learning disabilities, or another neurological abnormality.[6] After the prosecutor questioned the defense's reliance on

6. For this proposition, the Commonwealth cites *In re Bowling*, 422 F.3d 434, 439 (6th Cir.2005), in which the Sixth Circuit found a petitioner's adaptive functioning limitations do not show mental retardation where

the statements of Appellee's teacher, Ms. Pezola, on this topic, the parties had the following exchange with the trial court:

[Prosecutor:] Did you hear [Ms. Pezola] say that she really didn't know if [Appellee] was mentally retarded?

[Dr. Martell:] I heard her say that she thought he was educably mentally retarded.

[Prosecutor:] Did you also hear her say that she thought all of her students were educably mentally retarded?

Trial Court: Isn't that the purpose of the school?

[Prosecutor:] No, your Honor. It's for learning disabled students.

Trial Court: Well, they couldn't learn in regular school. They put them in this school because they had a problem learning.

[Prosecutor:] They had problems. They are not mentally retarded. There are other things. They are learning disabled.

Trial Court: Look, they had difficulty. They were challenged students. That's why they were put in here.

[Prosecutor:] Right. The point is was he mentally retarded or did he have a learning disability.

Trial Court: All right.

N.T. *Atkins* hearing, 5/12/11, 102–103. A short time later, Judge Berry asked Dr. Martell the following question: "So [Appellee] spent ten years in the Ashbourne School, which is a school for mentally retarded children?" *Id.* at 117. In emphasizing the relevance of this distinction, the Commonwealth points to the uncontradicted testimony of Dr. Spangler who had knowledge of the Ashbourne School's practice of admitting children with learning disabilities, not "mental retardation."

Arguing that the Commonwealth ignores the applicable standard of review, Appellee claims that the PCRA court's conclusion that he is "mentally retarded" is free from legal

they "are just as indicative of the other psychological disorders from which he suffers as they are of low level intellectual functioning."

error and its factual findings are supported by the record. Appellee contends that the Commonwealth has not raised a meritorious claim to warrant overturning the PCRA court's decision as he claims the Commonwealth is simply asking this Court to discount the PCRA court's credibility determinations and disregard the deference owed to the PCRA court's findings of fact.

First, Appellee asserts the PCRA court correctly found Appellee has subaverage intellectual functioning as his I.Q. score of 57 on the test administered by Dr. Crown fell within the range of intellectual disability. The PCRA court found this score was consistent with Appellee's need to repeat the first grade three times, his family history of low intellectual functioning, and his exposure to toxins and "repeated head injuries" as a child. Emphasizing the PCRA court found Dr. Crown's score to be reliable, Appellee points to Dr. Crown's assertion that there was no reason to believe Appellee's score was fraudulent and the fact that all experts, including Dr. Spangler, found Appellee was not malingering. In addition, Appellee notes the PCRA court considered Appellee's previous I.Q. scores, but found such results to be unreliable. Moreover, Appellee emphasizes the PCRA court rejected Dr. Spangler's opinion that Appellee's earlier I.Q. scores should be credited because Dr. Spangler could not vouch for the validity or accuracy of these tests. Although Dr. Martell did not question the validity of these scores, he asserted Appellee's I.Q. had been lowered by neurological insults such as boxing and chemical exposure.

Appellee also claims the PCRA court had ample support to conclude Appellee has significant adaptive deficits. The PCRA court relied on Dr. Martell's opinion that Appellee was impaired in five of the DSM–IV's eleven adaptive functioning categories: functional academics, social and interpersonal skills, self-direction, self-care, and safety. The PCRA court found limitations in functional academics as Appellee repeated the first grade three times and was behind grade level every year at the Ashbourne School. With respect to Appellee's socialization skills, the PCRA court noted school reports and

family members indicated Appellee was vulnerable to manipulation and had trouble making friends as a child. In finding Appellee lacked self-direction, the PCRA court relied on Ms. Pezola's observation that Appellee required structure and attention to stay on task. The PCRA court found Appellee had deficits in self-care as he wet himself until he was eleven, could not tie his shoes, and never helped his mother and sister cook or do laundry. With respect to safety, the PCRA court found serious deficits based on the aforementioned family anecdotes of Appellee's unsafe behavior, which includes an incident where Appellee injured himself climbing a tree with a chainsaw while intoxicated.

Appellee notes that the PCRA court found Appellee's ability to work and run a business were not inconsistent with a diagnosis of intellectual disability as his family gave him extensive help in running the business and Appellee's tasks did not involve high intellectual ability and could be learned through repetition. Appellee points to our decision in *Williams*, in which this Court upheld the PCRA court's finding that Williams was "mentally retarded" even though he held basic jobs and provided for his family as the DSM–IV and AAMR standards provide that individuals with "mental retardation" can function in society, hold low-skilled jobs, and have strong skills in distinct categories. *Williams*, 619 Pa. at 241, 61 A.3d at 992–93. In the same vein, while the PCRA court noted that Appellee was able to engage in financial transactions and understand some difficult stock trading concepts, the PCRA court accepted Dr. Armstrong's assertion that Appellee's ability to explain an advanced concept did not negate a finding of intellectual disability.

## 2. Discussion

■■ We begin our discussion by reaffirming the standard that this Court adopted in *Miller*: a petitioner seeking *Atkins* relief has the burden to prove by a preponderance of the evidence that he is intellectually disabled, and therefore, not subject to the death penalty. The PCRA court, as fact finder, had the responsibility of determining whether Appellee exhib-

its mild mental retardation or simply suffers from low to borderline intellectual functioning. While we recognize that the PCRA court's factual findings and credibility determinations are entitled to great deference if they are supported by the record, a PCRA court may not base its decision on speculation derived from testimony it finds credible. *Commonwealth v. Simpson*, 620 Pa. 60, 66 A.3d 253, 259 n. 6 (2013). After consideration of all the relevant information, we find the PCRA court's conclusion that Appellee is "mentally retarded" is not supported by substantial evidence.

In determining Appellee exhibits significant subaverage intellectual functioning, the PCRA court dismissed Appellee's pre-*Atkins* I.Q. tests in which he received scores of 80, 85, and 82 as it found the Commonwealth's expert, Dr. Spangler, "could not "specifically vouch for the veracity or accuracy of these earlier tests." PCRA Op. at 7. The PCRA court's suggestion that the Commonwealth was required to validate Appellee's normal I.Q. scores ignores the standard of review giving Appellee the burden to prove his claim of intellectual disability. There is no basis for the PCRA court's assertion that, according to Dr. Crown, Appellee's early test scores would have been "nullified" by factors such as "inconsistent testing conditions, wildly divergent median ranges, and out-of-date testing measures (known as the 'Flynn effect')." PCRA Ct. Op. at 8. Upon our review of the trial transcript, we find no support in Dr. Crown's testimony for any of these findings by the PCRA court.[7]

Moreover, defense experts did not claim Appellee's first two I.Q. scores were inaccurate, but simply noted the accuracy of the tests could not be assessed without the raw data of each test. In an apparent contradiction, Dr. O'Brien, who admit-

7. Dr. Armstrong, however, made a passing reference to the "Flynn effect" on cross-examination to suggest Appellee's pre-*Atkins* scores be adjusted to account for outdated norms. We express no opinion on whether the Flynn effect is a valid scientific theory as Dr. Armstrong found Appellee's scores, even when adjusted for possible inflation, are above the threshold for intellectual disability. Further, neither party has developed any argument on this topic and Appellee claims the PCRA court's finding with respect to the Flynn effect is "peripheral" to its ultimate ruling. Appellee's Brief, at 43 n.8.

tedly had not reviewed Appellee's pre-*Atkins* results before he prepared his expert report, refused to assess the reliability of these tests but conceded he relied on the results of Dr. Crown and Dr. Armstrong's post-*Atkins* testing without reviewing the raw data of their tests. Most significantly, Appellee's own experts offered conflicting opinions on whether Appellee's scores demonstrated "mental retardation" or borderline intellectual functioning; while Dr. Crown refused to rely on Appellee's early I.Q. scores and Dr. Armstrong did not comment on the reliability of these tests, Dr. Martell felt Appellee's first two test scores, which were above the threshold of intellectual disability, were reliable.

The defense also acknowledged Appellee was never diagnosed as "mentally retarded" prior to raising his *Atkins* claim; Dr. Martell found Appellee's label as "brain-injured" in grade school did not necessarily denote an injury, but could have referred to learning disabilities. Dr. Armstrong agreed that Appellee's mental impairment was consistent with other neurological abnormalities other than intellectual disability. The only suggestion that Appellee was intellectually disabled came from his teacher thirty years ago, Ms. Pezola, who admittedly did not know the difference between the terms "brain-injured" and "mentally retarded" and generalized all her students at the Ashbourne School into the category of "mental retardation." However, Dr. Armstrong admitted Ms. Pezola had limited experience as she had just begun her first year teaching Appellee's class after receiving certification in special education. Dr. Spangler, the only expert who had knowledge of the Ashbourne School's practices when Appellee was enrolled there in the 1970's, indicated the Ashbourne School specialized in educating children with learning disabilities and did not seek to enroll "mentally retarded" children. While acknowledging that Appellee did repeat the first grade three times, Dr. Spangler pointed out that Appellee's learning advanced at a normal rate after he was enrolled at the Ashbourne School.

Although defense experts agreed that mental retardation can be distinguished from other neurological abnormalities

such as learning disabilities, the PCRA court's commentary on the record demonstrated that it believed that all students with problems learning could be characterized as "mentally retarded." In failing to recognize this distinction, the PCRA court improperly equated evidence suggesting that Appellee may have had learning disabilities or another neurological abnormality with proof satisfying Appellee's burden to show significant subaverage intellectual functioning under the first prong of the *Miller* definition of mental retardation.

After giving no weight to Appellee's scores in the low to normal I.Q. range and the fact that Appellee was never diagnosed with mental retardation until he sought *Atkins* relief, the PCRA court placed emphasis on Appellee's I.Q. score of 57 obtained seven years after his *Atkins* petition was filed. Although all experts found Appellee did not purposefully manipulate his score, the PCRA court dismissed Dr. Spangler's suggestion that this score, which was 23 to 28 points lower than previous scores, should be viewed with suspicion as Appellee may not have been motivated to do well on a test leading to his execution. While indicating the Mittenberg index showed Appellee was not malingering, Dr. Martell conceded Appellee had a motive not to do well on post-*Atkins* testing.

Although Dr. Crown admitted that lack of effort could explain the "substantial" difference in scores, he adamantly maintained there was "no evidence" Appellee did not perform to the best of his ability even after Dr. Crown was confronted with recorded conversations in which Appellee told his sister about another death-row inmate who had played the "nut role" to "beat the system" and shared his lawyers urged him to avoid going to the law library, writing to his family, or talking to inmates believed to be "snitches." As there may be a powerful incentive to malinger and to slant evidence in cases where a petitioner has not been clinically diagnosed with intellectual disability and the record before the factfinder was created to seek relief under *Atkins*, this Court has found a petitioner's motivation to slant evidence of intellectual disability is a relevant consideration for *Atkins* factfinders in assess-

ing not only the validity of results of post-*Atkins* intelligence testing, but in analyzing the entire *Atkins* petition. *Commonwealth v. DeJesus*, 619 Pa. 70, 58 A.3d 62, 85–86 (Pa.2012).

While Dr. Martell accepted Appellee's childhood I.Q. scores outside the range of intellectual disability as reliable, defense experts did not provide adequate support for the theory that the dramatic drop in Appellee's I.Q. was caused by recreational boxing and exposure to toxins. Even though Dr. Martell had no specific information about Appellee's limited participation from age 14 to 15 in a children's boxing program, did not inquire if safety equipment was used, and admitted there was no evidence that Appellee had been injured in this short period, Dr. Martell practically diagnosed Appellee with dementia pugilistica ("boxer's brain") and compared him to fighter Mohammed Ali. When asked if Appellee had been injured in boxing, his mother indicated she could only recall one occasion in which Appellee's ear and eye were swollen and other occasions where he went to bed early. Mrs. Hackett expressed relief that Appellee's participation in boxing "didn't last for ... too long." Based on the foregoing claims, Dr. Spangler felt there was no evidence Appellee's limited recreational boxing as a fourteen-year old caused any brain damage and pointed out that Appellee's obtained his highest I.Q. score at age fifteen on an exam Dr. Martell found was probably reliable. Moreover, as there was no evidence that Appellee was injured in the boxing program, the PCRA court's finding Appellee had "repeated head injuries" is not supported by the record.

In a similar manner, while there is no dispute that Appellee was exposed to creosote, Sevin, malathion, and Roundup in his adolescence, the defense did not show a causal connection between these chemicals and Appellee's drop in I.Q. or his alleged intellectual disability. None of the defense experts claimed to have expertise in this area; Dr. Martell showed a lack of knowledge on this topic when he relied on Appellee's mother's assertion that all of these chemicals had been banned, as Dr. Armstrong admitted the chemicals were commercially available and indicated that malathion is currently

used in shampoo to treat head lice in children. Although Dr. Armstrong claimed that malathion causes a "variety of neurological symptoms" including memory loss and alleged that creosote is carcinogenic, neither Dr. Martell nor Dr. Armstrong could point to any scientific studies or reports which suggest these chemicals could cause significant changes in intellectual functioning levels. As such, the record lacks adequate support for Appellee's theory of a dramatic I.Q. drop in his adolescence.

As noted above, the results of intelligence testing alone are not sufficient to assess intellectual disability as an individual must also show significant adaptive limitations. In assessing the second prong of the *Miller* test, the PCRA court relied heavily on the opinion of Dr. Martell, who did not interview Appellee or perform any standardized testing, but based his reports on selective portions Appellee's school records and affidavits of his family members. Appellee's main expert on adaptive functioning, Dr. Martell, conceded that he did not have the opportunity to review all of Appellee's school records. Although Dr. Martell emphasized school reports indicating Appellee was easily manipulated, had no social skills, and required support and direction, Dr. Martell candidly admitted he had never seen reports indicating that Appellee himself was manipulative but outgoing and well-liked by his peers and did not mention reports indicating Appellee was capable of completing a task independently in a timely manner. While Dr. Martell emphasized claims from Appellee's family that he could not tie his shoes and wet himself in school until he was eleven, none of Appellee's school records document these issues and Ms. Pezola, who taught Appellee when he was ten, denied he had such problems. Although the PCRA court found Appellee's conduct in climbing a tree with a chainsaw demonstrated deficits in adaptive functioning, the PCRA court failed to recognize that Appellee was intoxicated during this incident.

Further, the PCRA court did not identify any evidence showing Appellee had significant adaptive limitations in his adolescence or adult life, but limited its review to his develop-

mental delay in early childhood and brushed aside evidence of adaptive skills he developed. By age seventeen, Appellee's school records indicated he was progressing normally and contained no indication he had any problems with skill acquisition, communication, or motor skills. In running his own business, Appellee operated lawn and snow removal equipment and scheduled his employees to provide service to numerous clients. While Appellee's mother claimed to have done the bookkeeping, she admitted Appellee was able to handle financial matters in paying each worker according to a predetermined rate. Before age eighteen, Appellee purchased two trucks for his business and paid off the loans ahead of time. Appellee's success allowed him to open an office and become part-owner of a beach home.

Appellee also showed manipulative behavior, as he lived in the Ogrod home and store his business equipment there without paying rent, used his business to target his clients for burglaries he later committed, and deceived authorities into allowing him off work release to travel to the shore on the weekends where he claimed to have contracts. After Appellee was incarcerated, Appellee showed his strong ability to communicate through well-written prison grievances and demonstrated understanding of stock market concepts and legal precedent in capital cases. We agree that the defense theories seem to be internally inconsistent as Dr. Martell conceded Appellee's adaptive functioning was on "a divergent course" with Dr. Crown's I.Q. results; while Appellee's I.Q. was supposedly plummeting, his adaptive functioning capabilities improved over time. While Appellee's ability to work and function in society would not necessarily prevent the PCRA court from finding Appellee is intellectually disabled, the record does not include evidence that Appellee had any significant adaptive functioning limitations beyond his early childhood years.

The PCRA court also accepted the defense's claim that Appellee's crime was not relevant to assess his adaptive functioning; Dr. Armstrong found Appellee had deficits in planning his behavior based on his errors on a maze drawing

test but indicated it was not important to ascertain how Appellee planned and organized his business and did not find it necessary to consider the facts of Appellee's crimes. However, Dr. Spangler felt that Appellee's crimes were not similar to offenses committed by intellectually disabled individuals which tend to show very little "aforethought." This observation is consistent with the United States Supreme Court's finding in *Atkins* of "abundant evidence that [intellectually disabled individuals] often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders." *Atkins*, 536 U.S. at 318, 122 S.Ct. at 2250, 153 L.Ed.2d 335.

In this case, Appellee planned the attack which ultimately led to Dunne's death. Initially, Appellee arranged to hire a hitman, offered two assassins considerable money, and gave out the victim's pictures to identify his targets. When these plans fell through, Appellee discussed the murder with his co-defendants in advance, drove the men to Ogrod's home in the middle of the night, and directed them to enter the basement of Ogrod's unlocked home where he knew the victims were sleeping. To conceal his participation in the crime, Appellee attempted to fabricate an alibi and destroyed evidence which included the pictures he gave a potential hitman and a crowbar used in the murder. This crime, which demonstrated Appellee was able to initiate, devise, and lead others in a premeditated plan, was relevant to an assessment of his adaptive functioning but was ignored by the PCRA court.

Based on the foregoing reasons, we find the PCRA court's conclusion that Appellee is intellectually disabled is not supported by substantial evidence. The PCRA court erred in concluding that Appellee met his burden to establish intellectual disability by a preponderance of the evidence when it improperly equated borderline intellectual functioning with "mental retardation" and failed to identify evidence of Appellee's significant limitations in adaptive functioning. Thus, we reverse the PCRA court's finding that Appellee is exempt from the death penalty.

## B. Assessing the *Atkins* standard adopted in Pennsylvania

In its second issue, the Commonwealth asks this Court to "adopt a more objective legal definition of mental retardation to combat fraud upon the courts." Commonwealth's Brief, at 3. Claiming the clinical definitions of "mental retardation" set forth in the DSM–IV and AAMR are inherently subjective, the Commonwealth asserts that such definitions are set by "biased organizations that have policy statements against the death penalty" and supported by professional journals that "encourage forensic psychologists to interpret mental retardation as broadly as possible to avoid [a defendant's] execution." Commonwealth's Brief, at 25. While the Commonwealth recognizes this Court declined to recalibrate the three-part *Miller* standard in *DeJesus,* the Commonwealth recommends this test be defined as an "objective legal standard" to reduce the possibility of feigned *Atkins* claims. Specifically, the Commonwealth recommends a petitioner be required to prove an I.Q. score of 70 or below, establish adaptive functioning limitations by a formal assessment tool, and demonstrate onset before age eighteen, without reliance on affidavits of interested family members or the "creative interpretation" of school records. Commonwealth's Brief, at 43. The Commonwealth also points to a measure taken by the Oklahoma legislature in passing a law that precludes defendants who have received a score of 76 or higher on a standardized I.Q. test from seeking *Atkins* relief. *See* 21 Okla. Stat. Ann. § 701.10b(C).

Appellee asks this Court to decline the Commonwealth's request to alter the *Atkins* standard for several reasons. First, Appellee asks this Court to find this issue waived for the Commonwealth's failure to raise it during the PCRA proceedings or in its statement pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). Second, Appellee finds unfounded the Commonwealth's assertion that clinical definitions are biased towards an anti-death penalty agenda as capital litigation presents a small fraction of the issues employing the assessment of intellectual disability, which extends to a broad array of contexts including, but not limited to, education, the

provision of governmental services, and the medical and mental health fields. Lastly, Appellee asserts there is no evidence of fraud in this case that warrants a change in the *Atkins* standard and claims the Commonwealth failed to show that the current *Miller* standard is unworkable as PCRA courts are capable of making credibility determinations when presented with conflicting facts and testimony.

Given that the Commonwealth has successfully argued that Appellee failed to prove his intellectual disability by a preponderance of the evidence, it is unnecessary for this Court to evaluate the Commonwealth's request to adopt a more stringent *Atkins* framework as Appellee has not satisfied the three-prong standard this Court implemented in *Miller*. Moreover, while the Commonwealth proposes that this Court should revisit *Miller*, reject the clinical definitions of intellectual disability, consider adopting cutoff I.Q. scores, and eliminate the petitioner's ability to rely on anecdotal evidence, the Commonwealth's challenge to the existing substantive *Atkins* standard involves policy concerns that would be more appropriately considered by the Pennsylvania General Assembly.[8] Although this Court was tasked with the responsibility of setting procedures to review *Atkins* claims in light of the Legislature's inaction, this Court has repeatedly refused to redefine the existing *Atkins* standard which derives from clinical definitions recognized by the United States Supreme Court in *Atkins*. *See DeJesus*, 619 Pa. at 106–107, 58 A.3d at 85; *Crawley*, 592 Pa. at 227, 924 A.2d at 615. Accordingly, we

**8.** This Court has consistently refused to adopt a "cutoff IQ score" for determining mental retardation, since it is the "interaction between limited intellectual functioning and deficiencies in adaptive skills that establish mental retardation." *Crawley*, 592 Pa. at 227, 924 A.2d at 615 (quoting *Miller*, 585 Pa. at 155, 888 A.2d at 631). On a similar note, the United States Supreme Court, by a 5–4 vote, recently struck down Florida legislation which provided that petitioners who had an I.Q. score above 70 had no right to *Atkins* relief and were precluded from presenting any further evidence of intellectual disability. *Hall*, —— U.S. ——, 134 S.Ct. at 1990. Reasoning this strict I.Q. cutoff violated the Eighth Amendment's prohibition on cruel and unusual punishment, the *Hall* Court provided that *Atkins* standards must allow petitioners who score within an I.Q. range accounting for the test's margin of error to present additional evidence of intellectual disability regarding difficulties in adaptive functioning.

decline the Commonwealth's request to alter the standard for measuring intellectual disability for *Atkins* purposes in Pennsylvania.

## III. CONCLUSION

For the foregoing reasons, we hold that the PCRA court erred in granting Appellee's petition for relief; accordingly, the PCRA court's decision and accompanying order of June 28, 2012, which found Appellee "mentally retarded" and exempt from the death penalty, is hereby vacated. We remand to the trial court for the reinstatement of the death sentence. Jurisdiction is relinquished.

Justices EAKIN and McCAFFERY join the opinion.

Chief Justice CASTILLE joins Parts I, II(A) and III of the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice BAER files a dissenting opinion in which Justices SAYLOR and TODD join.

Chief Justice CASTILLE, concurring.

I join Parts I, II(A), and III of the Majority Opinion. The Court, in my judgment, properly reverses the PCRA[1] court's vacatur of appellee's death sentence on grounds that he is mentally retarded, and thus is death-ineligible under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held that murderers proven to be "mentally retarded" cannot receive the ultimate penalty. The second claim (Part II(B)) asks the Court to consider a more basic question posed by cases such as this: whether the construct and approach developed for considering *Atkins* claims generally should be unthinkingly applied in cases involving a retrospective *Atkins* claim, *i.e.*, a claim forwarded by a defendant never diagnosed with mental retardation in his minority, now collaterally attacking his capital judgment. The Majority declines to alter

1. Post Conviction Relief Act, 42 Pa.C.S. § 9541 *et seq.*

the standard, concluding that such questions are better suited for the Pennsylvania General Assembly. In my view, and notwithstanding my joinder in the Court's primary *Atkins* analysis, several factors weigh in favor of considering the Commonwealth's second claim in tandem with any review of the propriety of the decision below: (1) this Court's central role in capital cases; (2) the Court's particularly central role in establishing both the substantive and procedural framework for *Atkins* claims, a circumstance forced upon us by the inaction of the General Assembly in the wake of *Atkins*; (3) the dynamic nature of this area where, for example, our most recent teaching in *Commonwealth v. DeJesus*, 619 Pa. 70, 58 A.3d 62 (2012) was issued after the hearing and decision below; (4) the fact that the PCRA court had no authority to follow a different standard than what existed when its decision was rendered; and (5) our duty not to turn a blind eye to fraudulent claims. Indeed, as has often been the case in capital matters, our duty here should exist even if the Commonwealth did not specifically forward the claim.[2]

## I.

*Atkins* is a one-way exception to the High Court's otherwise core insistence upon individualized assessments in the penalty phase of capital trials. Under the scheme dictated by the High Court, a capital defendant's mental condition—including a variety of intellectual impairments—was, and after *Atkins* remains—a relevant circumstance in mitigation. That is because, the High Court teaches, all capital defendants are constitutionally entitled to an individualized assessment, irrespective of the enormity of their crime, the gravity of additional aggravators, or the judgment of the states. Thus, the states are constitutionally forbidden to identify a single factor—say mass murders, or a murder committed by a prisoner already serving life imprisonment for murder—as solely deter-

---

**2.** Like the Majority, I will most often employ the term "intellectually disabled" in this concurrence except where, by necessity, the prior term makes more sense in a case litigated before the new term was adopted. *See* Majority Opinion, at 571–72, n. 2, 99 A.3d at 13–14, n. 2.

minative of penalty. *Atkins* eliminated the individualized assessment paradigm—but only in favor of defendants, and only for those murderers with a specifically proven intellectual condition: mental retardation under the DSM–IV, renamed intellectual disability under the DSM–V.[3] Despite the wide variety of possible intellectual impairments attending those with the condition, the Court has dictated that all are to be treated as if they were the same.

As a death-eligibility decision, *Atkins* reaches backwards in time, offering the prospect of relief for death-sentenced murderers whose judgments were final when *Atkins* altered the law, and who had an opportunity to present evidence of mental impairments or disabilities for individualized assessment. When *Atkins* was decided there were death-sentenced defendants, in Pennsylvania (such as mass murderer Harrison "Marty" Graham[4]) and elsewhere, who were removed from death row with no opposition or appeal from the government, since there was never any serious dispute that they were "mentally retarded" under the DSM–IV standard, and were so diagnosed in their minority. But, there are other defendants, such as appellee, who scored well above the cut-off range on multiple IQ tests in their minority and/or were never diagnosed with intellectual disability. The retroactive effect of *Atkins* obviously creates a powerful incentive for these defendants, their families, compliant mental health experts, and defense counsel (in Pennsylvania, invariably the same institutional and well-heeled federal counsel) to pursue retrospective collateral claims of impairment premised upon slanted, exaggerated, or simply false evidence of disqualifying "intellectual disability."

In cases like this, involving retrospective claims of intellectual disability against a backdrop of testing occurring during the defendant's minority revealing no such disability, the

3. The term "mentally retarded" is often cited as an example of a phenomenon that is coined a euphemism treadmill, whereby words introduced to replace offensive terms themselves become perceived as offensive over time. The phrase "euphemism treadmill" was introduced in 2002. STEPHEN PINKER, THE BLANK SLATE, 212–13 (2002).

4. *See Commonwealth v. Graham*, 541 Pa. 173, 661 A.2d 1367 (1995).

defendant must not only present affirmative current evidence of his supposed true intellectual capacity decades ago, but must also contend with the lack of evidence of disability extant from his minority, where there was no *Atkins*-based incentive to slant the facts. And so, in this case, appellee, represented by the Federal Community Defender's Office ("FCDO") in the *Atkins* "trial" below, produced a parade of mental health experts, as well as family, friends and acquaintances, called not only to express their own opinions of appellee's alleged disability, but also to attack the diagnoses and opinions of others made, years ago, where there was no apparent motivation to exaggerate or prevaricate.

I write separately to emphasize that this particular subclass of retrospective claims of intellectual disability should be viewed with a very high degree of skepticism. Pennsylvania is obliged to implement *Atkins;* but, this Court is also obliged not to encourage or approve dubious or fraudulent claims, constitutional or otherwise. Unlike trial court judges in Pennsylvania, who may see a single retrospective *Atkins* claim in a career, this Court, with direct appeal responsibilities in all capital cases, is positioned to see a bigger picture. And, it has become apparent that the "science" surrounding a diagnosis of intellectual disability is highly subjective even in the best of circumstances. A retrospective claim of intellectual disability forwarded in order to defeat a sentence of death under *Atkins* does not involve reliable circumstances, much less the best of circumstances; the claim is susceptible to manipulation and bias, and trial courts must be attuned to that fact. Thus, I agree with the Commonwealth that PCRA courts should not so cavalierly dismiss actual childhood evidence respecting intellectual disability just because a team of the usual defense experts, hired specifically in an effort to negate a final judgment of death, predictably hold a different view and prove intellectually very agile in dismissing all contrary evidence from the defendant's minority. Nothing in *Atkins* obliges states to vest in experts the power to remake the defendant's mental health history. This case presents a prime example of how a trial court, passing upon a single *Atkins* claim and

either insufficiently appreciative of the full picture or predisposed to grant relief irrespective of the actual merit of the claim,[5] can easily be misled by slanted "expert" testimony.

In addition to the patent errors made by the lower court which properly lead the Majority to reverse, I do not believe that claims such as this are properly resolvable by generic reference to the discretion of the collateral review court. The notion that **retrospective** *Atkins* questions must be deemed properly resolvable by deference to supposed credibility determinations involving present-day experts who dismiss and debunk tests administered decades ago, memorialized without any incentive for inaccuracy, which contradict their *Atkins*-purpose retrospective opinions—a deference which one judge may indulge, but another judge reject—is an exercise in studied pretense. I further explain my view below.

## II.

In this case, the only test suggesting that appellee had an IQ nearing the intellectually disabled range was a defense test administered solely for the purposes of proving a retrospective *Atkins* claim, and conducted when appellee was 44 years old, more than 20 years after his commission of murder. The definition of "mentally retarded" set forth in the DSM–IV (which this Court adopted in *Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624 (2005)), requires age of onset of intellectual disability prior to age 18, a rule the Court dutifully enforced in *Commonwealth v. Vandivner*, 599 Pa. 617, 962 A.2d 1170, 1185 (2009), *cert. denied*, 559 U.S. 1038, 130 S.Ct. 2060, 176 L.Ed.2d 416 (2010). The DSM–V retains the age of onset requirement. A claim such as presented here, that a present-day test defense administered to appellee at age 44 solely for *Atkins* purposes, combined with the opinion of hired defense guns,

5. The prior serial PCRA appeal in this case involved the lower court going to extreme lengths to award appellee a new trial premised upon a waived claim and a more than dubious legal theory. *See Commonwealth v. Hackett*, 598 Pa. 350, 956 A.2d 978, 989–91 (2008) (Castille, C.J., concurring, joined by Eakin and McCaffery, JJ.), *cert. denied*, *Hackett v. Pennsylvania*, 556 U.S. 1285, 129 S.Ct. 2772, 174 L.Ed.2d 277 (2009).

requires that non-litigation-driven tests in childhood be ignored, should be approached with the extreme skepticism it deserves.

Appellee is represented on appeal by a well-regarded private attorney, who was also counsel of record below. FCDO counsel do not appear on the brief. But, make no mistake, it was the FCDO that controlled litigation of the *Atkins* claim before the PCRA court. The FCDO devoted three different lawyers to the PCRA hearings; appellee also made use of five mental health experts, all apparently answering to the FCDO: the correspondence from the defense experts is addressed to FCDO counsel and the experts are experts who routinely testify when the FCDO raises *Atkins* challenges or other claims implicating mental health.[6] The Court is familiar with

**6.** The four experts testifying in favor of appellee were:

(1) Dr. Barry Crown (PhD psychology), who was utilized to testify on behalf of defendants/petitioners, represented by the FCDO or its earlier incarnation, in *Commonwealth v. Williams*, 619 Pa. 219, 61 A.3d 979 (2013) (*Atkins* claim) (Allegheny County), *Commonwealth v. Lesko*, 609 Pa. 128, 15 A.3d 345 (2011) (mitigating evidence claim) (Westmoreland County), *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220 (2006) (same) (Philadelphia County), *Commonwealth v. Wilson*, 580 Pa. 439, 861 A.2d 919 (2004) (same) (Philadelphia County), and *Commonwealth v. Williams*, 577 Pa. 473, 846 A.2d 105 (2004) (same) (Philadelphia County);

(2) Dr. Carol Armstrong (PhD psychology) who was utilized by the FCDO, or its earlier incarnation, to testify in *Commonwealth v. Miller*, 605 Pa. 1, 987 A.2d 638 (2009) (mitigating evidence) (Chester County), *Commonwealth v. Zook*, 585 Pa. 11, 887 A.2d 1218 (2005) (same) (Lancaster County), *Commonwealth v. Johnson*, 572 Pa. 283, 815 A.2d 563 (2002) (diminished capacity) (Berks County), *Commonwealth v. Bracey*, 787 A.2d 344 (Pa.2001) (mitigating evidence) (Philadelphia County), and *Commonwealth v. Stevens*, 559 Pa. 171, 739 A.2d 507 (1999) (same) (Beaver County);

(3) Dr. Daniel Martell (PhD psychology) who was utilized by the FCDO to testify in *Commonwealth v. Robinson*, 623 Pa. 345, 82 A.3d 998 (2013) (mitigating evidence claim) (Lehigh County), *Williams*, 619 Pa. 219, 61 A.3d 979 (*Atkins* claim) (Allegheny County), *Commonwealth v. DeJesus*, 619 Pa. 70, 58 A.3d 62 (2012) (same) (Philadelphia County), and *Commonwealth v. Miller*, 597 Pa. 333, 951 A.2d 322 (2008) (same) (Dauphin County); and

(4) Dr. John O'Brien (M.D. psychiatry) who was utilized by the FCDO or its earlier incarnation to testify in, *inter alia*, *Commonwealth v. Ali*, 624 Pa. 309, 86 A.3d 173 (2014) (Philadelphia County); *Commonwealth v. Roney*, 622 Pa. 1, 79 A.3d 595 (2013) (mitigating evidence) (Philadelphia County); *Commonwealth v. Banks*, 612 Pa. 56, 29 A.3d 1129

the FCDO's penchant for raising such claims, often against the wishes of their "clients;" and, according to some clients, not all mental-health-based claims pursued by the FCDO are aboveboard, *see Commonwealth v. Birdsong*, 611 Pa. 203, 24 A.3d 319, 352–53 (2011) (Castille, C.J., concurring), and some apparently are pursued only because the defendant declines FCDO intervention, leading the organization to claim the defendant must be mentally incompetent. *Commonwealth v. Ali*, 624 Pa. 309, 86 A.3d 173, 179 (2014); *Commonwealth v. Saranchak*, 570 Pa. 521, 810 A.2d 1197, 1198 (2002). *See generally Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244, 339 (2011) (Castille, C.J., concurring, joined by McCaffery, J.).

The FCDO's vast federal resources, represented by its cadre of lawyers and roster of experts, are deployed throughout the Commonwealth; individual trial courts, and county prosecutors for that matter, who see only the occasional capital case, may be unaware of the bigger picture, and the strategy at work.[7] This extraordinary shadow capability of

(2011) (competency to be executed) (Luzerne County), *Commonwealth v. Gibson*, 610 Pa. 332, 19 A.3d 512 (2011) (mitigating evidence) (Philadelphia County), *Miller*, 597 Pa. 333, 951 A.2d 322 (rebuttal testimony in support of *Atkins* claim) (Dauphin County). It appears that Dr. O'Brien has also testified on behalf of the Commonwealth in, *inter alia, Commonwealth v. Philistin*, 617 Pa. 358, 53 A.3d 1 (2012) (Philadelphia County), *Commonwealth v. Keaton*, 615 Pa. 675, 45 A.3d 1050 (2012) (Philadelphia County), *Commonwealth v. Birdsong*, 611 Pa. 203, 24 A.3d 319 (2011) (Philadelphia County), *Commonwealth v. Watson*, 597 Pa. 483, 952 A.2d 541 (2008) (Philadelphia County), and *Commonwealth v. Sam*, 597 Pa. 523, 952 A.2d 565 (2008) (Philadelphia County).

A fifth expert, Dr. Jethro Toomer (PhD psychology), did not testify but prepared a (flawed) report relied upon by Dr. Crown. Dr. Toomer has testified in, *inter alia, Roney*, 79 A.3d 595 (mitigating evidence) (Philadelphia County), *Williams*, 619 Pa. 219, 61 A.3d 979 (*Atkins* claim) (Allegheny County), *Banks*, 612 Pa. 56, 29 A.3d 1129 (competency to be executed) (Luzerne County), *Commonwealth v. Smith*, 606 Pa. 127, 995 A.2d 1143 (2010) (mitigating evidence) (Delaware County), *Miller*, 597 Pa. 333, 951 A.2d 322 (*Atkins* claim) (Dauphin County), and *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215 (2007) (mitigating evidence) (Philadelphia County).

7. The FCDO has refused to disclose to Pennsylvania courts their actual authority and funding to lawfully pursue capital matters in state court, causing further delay in a number of cases. *See, e.g., In Re Proceeding in Which the Commonwealth of Pennsylvania Seeks to Compel*, No. 2:13–

the FCDO, and its demonstrated tactics, give me additional pause when a retrospective *Atkins* claim is pursued by a defendant who was both subjected to objective tests in his minority, tests which plainly indicated he was not intellectually disabled, and was never otherwise diagnosed with the *Atkins* disability.

The fact that *Atkins* claims are peculiarly susceptible to manipulation becomes even more troubling if a court shows a naïve deference not only to the retrospective assessments and opinions of institutional experts, but also a deference to those experts' all-too-easy dismissal of the contrary findings of others, rendered decades ago, during the defendant's youth, and in circumstances where there was no incentive to falsely report. In this case, the FCDO's hired experts blithely dismissed appellee's childhood IQ test results (as well as other objective indicators of his intellectual capacity) on grounds that they supposedly had incomplete information regarding the circumstances surrounding the testing, did not know who administered the tests, or that the tests are unavailable to verify the data set and the scoring; as if the childhood testers had a burden to explain and justify themselves. A conscientious trial jurist should not fall for this sort of "junk science." Trial jurists should not be so naïve or quick as the PCRA judge here was to simply assume that the dismissive opinions of hired PCRA experts are a proper, much less persuasive, basis to simply ignore inconvenient, consistent, and unanimous contemporaneous accounts from the defendant's youth. Properly-qualified experts are free to offer their current opinions to a PCRA court, and they certainly can respond to cross-examination based upon the fact that what they believe is contradicted by all objective accounts from the defendant's youth. But, their expertise, properly understood, does not extend to establishing as fact which tests from the defendant's youth should be deemed legitimate or reliable. Indeed, in my

cv–01871 (FCDO removed capital case questioning funding from Court of Common Pleas to U.S. District Court for the Eastern District of Pennsylvania); an appeal in that matter is pending before the Third Circuit in *Commonwealth v. Defender Association of Philadelphia*, No. 13–3817.

view, the trial jurist here should have treated the defense experts' cavalier attitudes as proof itself that the retrospective *Atkins* claim was bogus.

## III.

The *Atkins* Court held that intellectually disabled individuals are exempt from the death penalty without announcing a national standard or prescribing a particular procedure for assessing the controlling status. Instead, the High Court left it to the individual states to devise how the exemption would be implemented. "The States tasked with implementing *Atkins* have been faced with various gray areas," *DeJesus*, 58 A.3d at 81, and the inexplicit constitutional standard, *i.e.*, "mentally retarded" or "intellectually disabled," is both difficult to apply and highly subjective.

The Pennsylvania General Assembly's response to *Atkins* has been silence, obliging this Court to implement the decision. We have provided trial courts with specific guidance respecting both trial level claims and retrospective claims raised on collateral review. *Commonwealth v. Sanchez*, 614 Pa. 1, 36 A.3d 24 (2011); *Bracey*, 986 A.2d 128 (Pa.2009); *Miller*, 888 A.2d 624 (Pa.2005). This Court followed the DSM–IV's clinical definition inferentially approved in *Atkins* and held that, to establish a claim of mental retardation, the defendant must prove by a preponderance of the evidence: (1) substantial intellectual impairment; (2) impact of the impairment on the defendant's everyday life (significant deficits in adaptive functioning); and (3) manifestation prior to age 18. *DeJesus*, 58 A.3d at 76–77 (*citing Miller*). On appellate review, this Court employs a deferential standard considering whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous. *Commonwealth v. Crawley*, 592 Pa. 222, 924 A.2d 612, 616 (2007).

The High Court in *Hall v. Florida*, —— U.S. ——, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), noted that many states utilize a three-part test similar to the DSM–IV test outlined in *Atkins*,

and further acknowledged the "critical role [that states play] in advancing protections and providing the Court with information that contributes to an understanding of how intellectual disability should be measured and assessed." *Hall*, 134 S.Ct. at 1998. But, turning its one-way ratchet one notch tighter, the 5–4 decision in *Hall* narrowed the authority of the states to define intellectual disability, holding that states cannot rely on a fixed IQ test number (in *Hall*, 70) as conclusive evidence of a defendant's intellectual disability if that score falls within a certain range, *i.e.*, "the test's acknowledged and inherent margin of error"—meaning, in practical terms, if IQ tests reveal an IQ of 75 or lower. This restriction exists, inexplicably according to the *Hall* majority, because "*Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection." *Id.* at 1998. The Court thus held that the Eighth Amendment requires states to permit a petitioner with such a demonstrated IQ to present additional evidence of mental retardation, including testimony regarding adaptive functioning deficits. *Id.* at 1998–99.

*Hall* sheds no light on this case; nor does it address the problem inherent in retrospective assessments of intellectual disability for *Atkins* purposes. In *Miller*, this Court already acknowledged that an IQ score or scores falling within a particular "range" (65–75) will be considered; we are compliant with *Hall*. In this case, the results of IQ tests performed during appellee's minority were far removed from the range indicating intellectual disability. And, the *Hall* Court had no occasion to address the fact that retrospective assessments of intellectual disability are difficult, highly subjective, and subject to manipulation.

The mentally retarded/intellectually disabled standard is difficult to apply, even in cases without an incentive to skew the facts; it does not admit to the certainty of, for example, an age cut-off. *See, e.g., Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Instead, an *Atkins* claim turns upon the results of IQ tests and evaluations, and other evidence speaking to the defendant's minority. This lack of

certainty is amplified when courts are asked to retroactively determine the issue. Death row inmates attempting to prove the diagnosis retroactively typically present testimony from experts who administer or review new tests to establish a present IQ level, and then extrapolate backwards, then offer opinions reflecting on the defendant's minority, and finally comment on the results of the tests and evaluations administered during the defendant's minority, which were undertaken not for the non-*Atkins* purpose of assessment and education, but instead for avoidance of the death penalty. The stakes are as high as it gets; and the defendant, as here, knows full well that low test scores advance his prospects. This is another one-way ratchet: As the Commonwealth's expert explained: "it's very easy to lower an IQ. You can be depressed, just not motivated. . . . But you can't be dull and actually pretend to be intelligent." N.T., 11/17/2011, at 52. This obvious fact raises a question whether appellee's defense-produced IQ score of 57 should even be considered in light of two childhood tests that placed his IQ in the 80–85 range, tests that were supported by a third test of appellee in his early adulthood, where he scored an 82. Thus, the Majority is correct to find that the PCRA court erred when it determined that appellee met the intellectual functioning prong of the *Miller* test.

The *Atkins* standard is also highly subjective: the Court has already seen that different experts in the field routinely reach abjectly opposite conclusions respecting who is intellectually disabled, at least for purposes of death penalty ineligibility. And, it would be irresponsible to ignore that the personal beliefs of the expert, who obviously knows the consequences of his testimony, may influence the opinion. Equally as troubling is that it appears that the relevant "experts" cannot even agree on basic parameters, such as what causes intellectual disability. For example, in *Williams*, 619 Pa. 219, 61 A.3d 979, an expert [8] for the defense testified (quite logical-

8. The expert was Dr. William Musser, a neurologist and psychiatrist who was part of the John Merck Program at Western Psychiatric Clinic located in Pittsburgh, Pennsylvania.

ly, in the mind of this author) that mental retardation "was formed from a brain injury known as 'static encephalopathy,' which occurs at the end of pregnancy, at the time of delivery, or during very early stages in life, and is not the result of childhood abuse." *Id.* at 986. Yet, in this case, this seemingly basic "cause" and age of onset played no role in the defense case or the PCRA judge's conclusion. Instead, appellee presented testimony from two different experts who testified that his exposure to toxins and the extracurricular activity of boxing in his teens factored into their retrospective diagnosis of mental retardation. Employing factors like exposure to toxins or voluntary participation in activities potentially harmful to the brain in one's teens is incompatible with the testimony in *Williams* that the brain injury causing intellectual disability is organic and occurs very early in life. This is but one ready example of the apparent *ad hoc* subjectivity of the expert "science" surrounding intellectual disability in the *Atkins* retroactive diagnosis scenario.

Furthermore, to the extent that exposure to environmental factors and behavioral choices in one's teens result in brain damage or injury, the result should be a diagnosis of something other than *Atkins*-style intellectual disability, at least under the current reach of *Atkins*. Similarly, the notion that environmental and behavioral factors affect and cause intellectual disability necessarily calls into question the relevance of IQ tests purporting to prove intellectual disability that are conducted decades after a defendant's minority. Notably, appellee's experts here, in deeming the defense-administered IQ test score of 57 to be both controlling and adequate to negate the much earlier and better scores appellee achieved in his youth, did not purport to account for environmental and behavioral events in appellee's life in the 26 years that elapsed since he was 18, postage-of-onset events which, under the defense theory, may have accounted for the significant decrease in appellee's performance. Even assuming the legitimacy of the defense theory that environmental and behavioral factors are relevant to assessing *Atkins* style intellectual disability, the defense cannot have it both ways. In my view,

as a matter of law, the defense test result produced here was not even relevant to establishing whether appellee was intellectually disabled before age 18. Appellee may today have some sort of intellectual disability; but that does not mean he had the specific disability that falls within the narrow ambit of the exemption set forth in *Atkins*, which was strictly limited to those who suffered from intellectual disability manifesting before the age of 18.[9]

In my view, the PCRA court failed to take these realities into consideration when it fell for the diffuse FCDO presentation here.

## IV.

I also write to note that the Court's decision in *DeJesus*, which was handed down after the PCRA court ruling here, should help lower courts facing retrospective *Atkins* claims to avoid the errors made by the judge below. *DeJesus* involved, *inter alia*, a Commonwealth challenge to the propriety of the three-factor test used to determine mental retardation approved in *Miller* in cases involving retrospective assessments; the Commonwealth argued for a more objective standard, and also challenged the "preponderance of the evidence" burden of proof standard, arguing for the more rigorous "clear and convincing" standard. The *DeJesus* Court ultimately reaffirmed the standards set forth in *Miller*, but offered further guidance when confronted with the prospect of a malingerer or when there is no diagnosis of relevant intellectual disability during the defendant's youth and the claim of *Atkins* disability is raised retrospectively on collateral review.

The *DeJesus* Court noted that in *Ex Parte Briseno*, 135 S.W.3d 1 (Tex.Crim.App.2004), the court articulated seven factors it deemed relevant in weighing *Atkins* evidence related to adaptive functioning. The *Briseno* court explained that the adaptive behavior criteria were exceedingly subjective, and "undoubtedly experts will be found to offer opinions on both

9. Apparently, the Dissenting Opinion would view the multiple inconsistencies in appellee's agile *Atkins* theories as mere credibility matters.

sides of the issue in most cases[.]" *Briseno,* 135 S.W.3d at 8. Because of this reality, the *Briseno* court offered its evidentiary factors to guide the analysis. *Id.*

Notably, this Court in *DeJesus* found these seven factors to be particularly apt where no formal diagnosis of intellectual disability was made prior to age 18 and the disability claim was forwarded strictly in the context of seeking *Atkins* relief, noting that in such circumstances "there [was] a powerful incentive to malinger and to slant evidence." *DeJesus,* 58 A.3d at 85. We concluded that these ulterior motives were a relevant consideration to argue to the *Atkins* fact finder, "not only for purposes of assessing the defendant's post-*Atkins* intelligence and aptitude test results, but also in assessing the defendant's overall case for *Atkins* relief." *Id.* The Court indicated that while the *Briseno* factors were helpful, the factors would not be elevated to any particular favored or presumptive status; we left it to the finder of fact to determine whether the *Briseno* factors should be employed and the weight to be given to them in an individual case. *Id.* at 85–87.

The seven factors identified in *Briseno* court were as follows:

- Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?
- Has the person formulated plans and carried them through or is his conduct impulsive?
- Does his conduct show leadership or does it show that he is led around by others?
- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
- Can the person hide facts or lie effectively in his own or others' interests?

- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseno*, 135 S.W.3d at 8–9. The *DeJesus* Court did not itself address the factors in application, since we were remanding for further proceedings.

More recently, in *Williams*, the Court noted that *DeJesus* was applicable when the trial court determined the *Atkins* claim in post-conviction proceedings. The *Williams* Court, however, did not find that the *Briseno* factors were implicated because the Commonwealth did not raise a claim of malingering.

The case *sub judice* squarely presents an opportunity to consider how the *Briseno* factors could help trial courts avoid errors. The Commonwealth here has argued all along that appellee is malingering; the Commonwealth emphasizes that appellee was never considered mentally retarded in his youth; and, in fact, the test scores from appellee's childhood show that his IQ was in the low to mid–80's, which is well above the recognized IQ standard for intellectual disability (70, with a margin of error of plus or minus 5). The *Briseno* factors, properly applied here, weigh against any finding that appellee suffered from limited adaptive functioning.

Respecting the first factor, appellee was never diagnosed as "mentally retarded," nor was he labeled mentally retarded by a teacher or school administrator. Instead, the school records establish that he was considered "brain injured," which is not the same thing. Testimony from Dr. Paul Spangler, who was employed as a psychologist at the Elwyn Institute outside of Philadelphia from 1971 to 1976, testified that the Ashbourne School that appellee attended specialized in educating students with brain injury who had a diagnosis of "minimal brain dysfunction." N.T., 11/17/11, at 10. Dr. Spangler further testified that students diagnosed with "mental retardation" were not normally admitted to the Ashbourne School; instead, the special school was for students identified similarly to

appellee, as being dull/normal or of low average intelligence, and not mentally retarded. *Id.* at 12–15. Testimony and affidavits from appellee's family members and childhood friends similarly suggested that he was "slow;" being classified as "low-average" intelligence or identified by peers and family members as being slow is not the same as being mentally retarded/intellectually disabled.

The second factor looks at whether the person formulated plans and carried them through. The evidence at the PCRA proceedings relating to appellee's business acumen as well as the evidence surrounding the murder weigh strongly against appellee's retrospective claim on this factor. Before the age of 18, appellee managed to develop a small-scale lawn-mowing business which he grew into a thriving landscaping business, which later included snow removal. The business eventually grew to include an office, two full-time employees, and three part-time employees, including a receptionist who worked on Saturdays. Appellee bought his first truck for the business at age 16 and was able to purchase another vehicle at 18. There was testimony that appellee received help from his mother and father related to bookkeeping and purchasing equipment. However, additional testimony suggested that appellee took charge of all of the scheduling, as well as writing estimates for potential customers. Even assuming that appellee received help related to the administrative aspects of his business, the fact remains that he ran a successful small business from the time he was sixteen until the time of the murder, which occurred a week before his twenty-second birthday, plainly demonstrating an ability for formulate plans and carry them through—and all at a time where he had no incentive to hide his actual intellectual functioning.

Furthermore, the facts of the underlying crime show that appellee was capable of formulating a plan and carrying it through: he contacted a friend to help him find a hitman to "bump someone off for money." The Commonwealth also demonstrated that appellee and his co-conspirator actually hired someone to commit the murder, but that the hired killer backed out because he disagreed with the proposed attack.

*Commonwealth v. Hackett,* 534 Pa. 210, 627 A.2d 719, 721–22 (1993). Certainly, contacting a third party to help him find a hitman, and later hiring a hitman, shows—better than the retrospective opinion of a hired expert—the ability to formulate a plan and carry it through.

The third factor considers whether the defendant was a follower or a leader. Again, returning to the examples discussed above, appellee ran his own landscaping business and established a plan to hire a hitman to kill Gregory Ogrod— plain indications that he was a leader. Testimony from the receptionist for his business established that he hired her as a favor, because she needed the money, suggesting that he was able to control and organize his business. Similarly, testimony from the PCRA hearing also showed that appellee had taught himself about short-selling stocks while he was in prison. Even though his understanding and explanation of short-selling might have been basic, taking the initiative to learn about such a concept shows leadership. And, finally, there was testimony concerning appellee's ability to manipulate others, securing for himself free lodging, and misleading his probation officer so he could visit his beach home.

The fourth factor considers whether a defendant's conduct in response to external stimuli is rational and appropriate, even if socially unacceptable. In this case, it was clear that appellee wanted to kill Gregory Ogrod because the two men did not get along. Appellee moved into a house with Ogrod and Ogrod's brother (who was also appellee's employee). Ogrod did not like that appellee was not paying rent and the living arrangement "went bad." *Hackett,* 627 A.2d at 721. Appellee's response—to kill Ogrod—was obviously socially unacceptable, but it offered appellee the prospect of the result he desired—he would no longer have to live with Ogrod, but would be able to continue living in the house.

The fifth factor, which relies on consideration of appellee's response to oral and written questions, is irrelevant as there is nothing in the record speaking to the circumstance.

The sixth factor takes into account whether the person can hide facts or lie effectively. Again, turning to the circumstances surrounding the crime, it is clear that appellee knew what evidence could be used against him; he made sure that the photographs he had given to his friend for purposes of hiring a hitman were destroyed; he asked his girlfriend to lie on his behalf; and he also discarded the crowbar used in the murder in a dumpster a week after the crime. *Hackett*, 627 A.2d at 722. Additionally, at the PCRA hearing, testimony suggested that appellee had lied to the court related to a prior breaking and entering conviction when he told the court he had landscaping contracts at the shore so that he could continue to go to his shore house on weekends while he was on work release. N.T., 11/16/11, at 27–28. Appellee's conduct satisfies this factor.

Finally, the seventh factor considers whether the crime itself required forethought and planning. As already discussed, appellee and a co-conspirator (Marvin Spence) conspired to kill Ogrod and his girlfriend (if she got in the way).[10] Appellee approached a friend about hiring a hitman. When that avenue was unproductive, Spence approached a third party who appellee and Spence actually "hired" for the job. When that alternative fell through, appellee, who had a key to the house, armed Spence (and two other co-conspirators) with knives and a crowbar to attack Ogrod and Dunne while they were sleeping. The circumstances amply demonstrated forethought and planning; indeed, appellee approached his friend regarding a hitman in the spring of 1986, yet the killing occurred much later, on July 31, 1986. Furthermore, the circumstances of the actual crime show that appellee armed his co-conspirators prior to going to the murder scene, let the co-conspirators into the house, and intentionally approached the victims at a time they knew the victims were sleeping. *Hackett*, 627 A.2d at 722. The crime itself, and the various attempts to commit murder, required forethought, planning,

10. As it happened, the girlfriend, Maureen Dunne, was the unfortunate murder victim.

and patience; they were not the result of any impulsive behavior on appellee's behalf.

I would conclude that the adaptive functioning limitations found by the PCRA court, and discussed in great detail by the Majority and Dissenting Opinions, when considered in conjunction with the *Briseno* factors discussed above, do not at all support the PCRA court's finding that appellee suffered from significant adaptive limitations, as was required to establish intellectual disability by a preponderance of the evidence. The court's decision below is unsupportable, and therefore, reversible.

## V.

Finally, I write in respectful response to the Dissenting Opinion's rejoinder, which characterizes my position as reflecting only a concern with the conduct of the FCDO, and further claims that I am "disregard[ing] the most basic facet of appellate review," *i.e.*, deference to credibility determinations of the PCRA court. Dissenting Opinion, at 631, n. 2, 640–42, 99 A.3d at 49, n. 2, 55–56 (Baer, J.).

I respect that some members of the Court turn a blind eye to the questionable conduct of the FCDO, but my concerns with the FCDO here are expressed only as they relate to a broader question, which the dissent never confronts. My jurisprudential concern—not a new one in this area—is directed at the proper review paradigm when a court is faced with a retrospective *Atkins* challenge, and where (unlike with a murderer such as Marty Graham) there were no findings (or here, even indications) of *Atkins*-style intellectual disability manifested during the defendant's minority.

The unanimous decision in *DeJesus* suggests that this Court is not naïve: retrospective *Atkins* claims are particularly ripe for fraud and abuse. I was the author of *DeJesus*. My position here, which is unconstrained by the responsibilities of majority authorship (as are the dissent's views), follows logically from *DeJesus*, with a greater appreciation of what our continued experience with *Atkins* claims and records—such as

this one—reveal. The issues are not so simple as the dissent pretends.

The Court's first foray into the *Atkins* arena resulted in a decision deferring the question to collateral review because the trial record addressed mental retardation for other purposes, and was not directed at establishing an *Atkins* claim. *Commonwealth v. Mitchell*, 576 Pa. 258, 839 A.2d 202 (2003). Although unstated in *Mitchell*, in the disruptive wake of *Atkins*, there obviously was an expectation that the General Assembly would act, since *Atkins* deferred the implementation of its new rule to the individual states. The General Assembly is obviously better positioned to consider the variety of issues attending *Atkins*, including the most basic question of the operative definition of mental retardation/intellectual disability, burdens of proof, etc. *See also* Majority Opinion, at 608–10, 99 A.3d at 36–37. Indeed, the General Assembly was free to go farther than the minimal *Atkins* command.

The Legislature has failed to act, however. Faced with this void and the reality of ripe *Atkins* challenges forwarded in discrete cases, this Court set forth a standard to review claims of mental retardation on collateral review in *Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624 (2005), as well as the standard of appellate review in *Commonwealth v. Crawley*, 592 Pa. 222, 924 A.2d 612 (2007). Thereafter, we answered procedural and substantive questions governing such claims on collateral review in *Commonwealth v. Bracey*, 604 Pa. 459, 986 A.2d 128 (2009), as well as the governing standards and procedures for *Atkins* claims at trial in *Commonwealth v. Sanchez*, 614 Pa. 1, 36 A.3d 24 (2011). Finally, as discussed above, we reaffirmed that *Atkins* claims must be established by a preponderance of the evidence, and suggested that a collateral review court may consider the *Briseno* factors. *DeJesus*, 58 A.3d at 84–88.

This is, in short, a dynamic area. Our most recent decision, relevant here, is *DeJesus*; and the PCRA court did not have its benefit. To turn a blind eye to complications as they arise in this area can become an abdication of responsibility. In my judgment, the *DeJesus* Court's recognition of the prospect of

fraudulent retrospective *Atkins* claims is a reality in this case. Thus, I have addressed it. I go on to suggest an appropriate review paradigm given the realities of retrospective *Atkins* litigation, adjustments consistent with our decision in *DeJesus*, and I apply *DeJesus* here.

Continuing in its studied simplicity, the dissent also alleges that I have disregarded the evidentiary "value" of expert opinions which, the dissent generically says, can be sufficient to support a finding of fact. The dissent then states that when appellee's hired experts testified that appellee met the clinical definition of intellectual disability, and simply dismissed the contrary evidence from his youth (while articulating a self-contradictory view on environmental factors affecting IQ test performance), appellee presented sufficient evidence of that "fact," rendering the PCRA court's *Atkins* conclusion unreviewable. Dissenting Opinion, at 640–42, 99 A.3d at 55–56. If only responsible judging were so simple. In addition to the points I have already made, I would note that, in fact, the ultimate determination of mental retardation (intellectual disability) is a mixed question of law and fact. *Crawley*, 924 A.2d at 615. If the court gets the law wrong—including the proper way to look at evidence in the circumstances, and the proper bounds of so-called expert evidence—no deference is due.

The dissent has merely dipped its toe into the shallow end of this particular, deep pool of water. The trial court "credited" a thoroughly bogus retrospective *Atkins* claim. I join the Majority's mandate for this additional reason.

Justice BAER, dissenting.

Following a hearing on the *Atkins*[1] claim brought by Richard Hackett (Appellee), which required Appellee to prove, by a preponderance of the evidence, that he is mentally retarded pursuant to the standard adopted by this Court in *Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624 (2005), the PCRA court granted relief. Because the court accepted Appellee's

1. *See Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

evidence, and rejected the contrary evidence proffered by the Commonwealth, it found that Appellee met the appropriate definitions of mental retardation set forth in *Miller* and, therefore, is ineligible for the death penalty. The Majority reverses, concluding that the record does not support the lower court's factual findings. Respectfully, its conclusion is simply unsupportable under the appropriate standard of review on appeal. The PCRA court heard from five experts. Four of them offered their opinions that, to a reasonable degree of scientific certainty, Appellee is mentally retarded. One opined that he was not. This evidence was accompanied by other testimony that, to varying degrees, supported or undermined their expert opinions. After listening for six days, the PCRA court docketed a thoughtful nineteen page opinion replete with careful citations to the record concluding that Appellee's experts and other testimony were more credible than that presented by the Commonwealth. The PCRA court could have reached the opposite conclusion because, as recognized by the Majority, there was evidence of record to support either a finding of mental retardation or "dull normal" functioning. However, once the PCRA court, after listening to the five experts and six days of testimony, adjudged credibility and reached its decision, this case, at least on this issue, was over. The Majority herein inexplicably fails to recognize that the evidence it relies on in reversing the PCRA court has already been considered and rejected by the fact-finder. The Majority's re-weighing of the evidence constitutes an abuse of our appellate standard of review.[2] I am thus compelled to adamantly dissent. To make my point, I have reviewed all of the evidence and then, seriatim, the various points discussed by the Majority.

The U.S. Supreme Court has barred the execution of mentally retarded persons. *Atkins*, 536 U.S. 304, 122 S.Ct. 2242,

2. Although I acknowledge the position set forth by the Chief Justice in his concurring opinion regarding his frustration with the Federal Community Defender's Office and their litigation strategies in capital cases, I respectfully believe that his Concurring Opinion, like the Majority herein, has disregarded the most basic facet of appellate review: that we are bound by the factual and credibility determinations of the PCRA court where those findings are supported by the record.

153 L.Ed.2d 335. In *Miller*, 585 Pa. 144, 888 A.2d 624, we adopted the criteria for diagnosing mental retardation, which is now more commonly referred to as intellectual disability, that is used by the American Association on Intellectual and Developmental Disabilities (AAIDD) (previously, the American Association on Mental Retardation (AAMR)) and the American Psychiatric Association. Under these criteria, as set forth in *Miller*, the following requirements must be met for a finding of mental retardation: 1) limited intellectual functioning; 2) significant adaptive limitations; and 3) onset of the condition before the age of 18. *Miller*, 888 A.2d at 630.[3] To be considered mentally retarded, or intellectually disabled, a petitioner must prove these three criteria by a preponderance of the evidence. *Id.* at 631.

The PCRA court in this case properly applied the standard we established in *Miller* and concluded that Appellee met the definition of mental retardation. Thus, the only question before us on appeal is whether the PCRA court erred in reaching this conclusion based on the evidence presented. In this regard, "our standard of review of the PCRA court's determination regarding whether a petitioner is mentally retarded is a mixed question of law and fact," which we have described as follows:

A question involving whether a petitioner fits the definition of mental retardation is fact intensive as it will primarily be

**3.** As we explained more fully in *Miller:*

[O]ur analysis of this issue must begin with the proper definition of "mental retardation" for purposes of the application of *Atkins* in Pennsylvania. The United States Supreme Court cited two different definitions of "mental retardation" in *Atkins,* and we will first consider these definitions. The AAMR defines mental retardation as a "disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in the conceptual, social, and practical adaptive skills." Mental Retardation at 1. The American Psychiatric Association defines mental retardation as "significantly subaverage intellectual functioning (an I.Q. of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." DSM–IV at 37. Thus, as noted by the PCRA court, both definitions of mental retardation incorporate three concepts: 1) limited intellectual functioning; 2) significant adaptive limitations; and 3) age of onset.
888 A.2d at 629–30.

based upon the testimony of experts and involve multiple credibility determinations. Accordingly, our standard of review is whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous. We choose this highly deferential standard because the court that finds the facts will know them better than the reviewing court will, and so its application of the law to the facts is likely to be more accurate.

*Commonwealth v. Williams*, 619 Pa. 219, 61 A.3d 979, 981 (2013) (quoting *Commonwealth v. Crawley*, 592 Pa. 222, 924 A.2d 612, 616 (2007)).

Our review of the grant of post-conviction relief is limited to an examination of whether the PCRA court's determination is supported by the record and free from legal error. *Commonwealth v. Moore*, 569 Pa. 508, 805 A.2d 1212, 1214 n. 1 (2002). We cannot disturb the factual findings of the PCRA court, which hears evidence and passes on the credibility of witnesses, if they are supported by the record, even where the record could support contrary findings. *Commonwealth v. Jones*, 590 Pa. 202, 912 A.2d 268 (2006). Additionally, our "scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party." *Commonwealth v. Duffey*, 585 Pa. 493, 889 A.2d 56, 61 (2005). Accordingly, if the PCRA court's determinations with regard to Appellee's *Atkins* claim are supported by the record and free from legal error, we are bound by them, even where our reading of the record also reveals support for contrary findings.

Regarding the first criteria, which is whether Appellee demonstrated limited intellectual functioning by a preponderance of the evidence, the PCRA court found that he had. In my view, this factual finding is supported by the record and free from legal error. Dr. Barry Crown, an expert in clinical and forensic psychology and neuropsychology with decades of experience in treating patients with mental retardation, tested Appellee on July 22, 2009, on the Wechsler Adult Intelligence

Scale (WAIS), which the Commonwealth expert, Dr. Paul Spanger, agreed was the "gold standard" of individually administered tests. Notes of Testimony (N.T.), *Atkins* Hearing, 11/16/2011, at 61. Appellee scored an I.Q. of 57, with underlying scores in verbal comprehension (74), perceptional reasoning (65), working memory (58), and processing speed (53), which each fell below the threshold score of 75 and within the defined range of sub-average intellectual functioning.[4]

In addition to administering the I.Q. test, Dr. Crown reviewed the facts of the case and the evidentiary exhibits, talked to Appellee's prior trial counsel, and opined that, based on his review of this information, Appellee was mildly mentally retarded. N.T., *Atkins* Hearing, 5/11/2011, at 53 ("With regard to his IQ, his intelligence quotient, which is prong one of the definition, he certainly falls within the guidelines and the diagnostic criteria for intellectual disability or mental retardation."). Continuing, Dr. Crown stated that Appellee's I.Q. of 57 placed him "below the first percentile" of the population. *Id.* at 63.

Further noting the homogeneity[5] on Appellee's subscale scores, Dr. Crown testified that he found no reason to believe Appellee's score was the result of malingering or fraud, and explained that there were specific indicators of malingering which were not present with Appellee. N.T., *Atkins* hearing, 5/11/2011, at 64 ("And in people who are retarded or intellectually disabled, there should be a great deal of homogeneity. In addition, in my clinical interview, he was forthright and forthcoming. There was nothing to suggest that he was attempting to fake this.") Dr. Crown also testified that his opinion about Appellee's sub-average intellectual functioning was supported

4. We explained in *Miller* that limited intellectual functioning is best represented by I.Q. scores which are approximately two standard deviations (or 30 points) below the mean (100), and provided that "a subaverage intellectual capability is commonly ascribed to those who test below 65–75 on the Wechsler scales." 888 A.2d at 630.

5. In this context, "homogeneity" refers to logical consistency. Thus, Appellee's sub-scores indicated internal consistency, which would be expected for one who is mentally retarded, rather than one who is attempting to fool the tester.

by several other factors, including Appellee's early academic history: he repeated the first grade three times and struggled with reading; he had genetic links to mental deficiency as exhibited by his father and brother; he was exposed to toxins at an early age; he engaged in boxing; and he had difficulty understanding the concepts of his defense at his criminal trial.

Dr. Daniel Martell, a forensic psychologist and assistant clinical professor in the Department of Psychiatry and Behavioral sciences at UCLA's School of Medicine, agreed with Dr. Crown that Appellee is mentally retarded. N.T., *Atkins* Hearing, 5/12/2011, at 32–33 (explaining that based on all of the data on Appellee, including three IQ test scores from when Appellee was a child, "[h]e clearly has a significantly subaverage intellectual function and I believe it's real and I believe it's true."). Dr. Martell testified that there is a way to test for malingering, referred to as the Mittenberg Index, and that Appellee's score of 57 remained valid after applying the index. *Id.* at 17; *id.* at 18 ("My conclusion is that he was not malingering. That those data are, in fact, valid and it's a real score."); *id.* ("He was not malingering for Dr. Crown. He was not malingering for Dr. Armstrong. There's no evidence in the record that he has malingered on any of these tests.").

Dr. John O'Brien, a psychiatrist, evaluated Appellee and reviewed the records and conclusions of other experts, and concluded that Appellee met the diagnostic criteria for mental retardation. N.T., *Atkins* Hearing, 5/12/2011, at 177–178. Finally, Dr. Carol Armstrong, a neuropsychologist and defense expert, conducted a clinical interview of Appellee and administered forty-five neuropsychological subtests to him, which assessed his memory processes, reasoning, judgment, verbal abilities, ability to perform different tasks, and included two parts of the I.Q. test given by Dr. Crown. N.T., *Atkins* Hearing, 11/15/2011, at 90–93. She testified that Appellee has significant subaverage intellectual functioning, *id.* at 111, and that the results she received substantiated Dr. Crown's reported I.Q. score of 57. *Id.* at 93; 98. Additionally, Dr. Armstrong testified that Appellee was not malingering. *Id.* at 94–95. She observed that Appellee had neuro-psychological

problems at birth, and that his subsequent exposure to toxins as a child and through adulthood, as well as head injuries, hampered the growth of his brain. *Id.* at 104–06.

The PCRA court relied on the testimony of Drs. Crown, Martell, O'Brien, and Armstrong, as well as testimony from Appellee's family regarding his assistance in the family's puppy kennel from the age of ten to eighteen, which involved the use of multiple toxins several times a year, testimony about Appellee's lawn care business, which involved his use of pesticides without the benefit of a respirator or protective clothing, and testimony about Appellee's involvement in a boxing club for a year when he was fourteen. It concluded, based on the evidence and the experts' opinions, that Appellee demonstrated sub-average intellectual functioning.

In reaching this conclusion, the PCRA court considered and rejected the testimony of the Commonwealth's expert, Dr. Spangler, an expert in developmental and intellectual disability, who reviewed Appellee's elementary school and hospital records, and concluded that Appellee's I.Q. was in the range of "dull normal" rather than mental retardation. N.T., *Atkins* Hearing, 11/17/2011, at 12. Dr. Spangler's conclusion in this regard derived primarily from three prior I.Q. tests administered to Appellee: a 1972 test administered by St. Christopher's school, with a score of 80; a 1979 test administered by the Counseling or Referral Assistance Services (CORA), with a score of 85; and a 1988 Beta–2 screening test administered by prison officials, with a score of 82.

In directly comparing the parties' lead experts, the PCRA court found Dr. Spangler's conclusion less credible than that of Dr. Crown premised on its observations that Dr. Spangler did not personally interview Appellee or administer any developmental or I.Q. tests and did not dispute the validity of the test administered by Dr. Crown. Additionally, the court noted that Dr. Spangler agreed with Dr. Crown, as well as all of the other defense experts, that there was no significant malingering by Appellee on Dr. Crown's test. N.T., *Atkins* Hearing, 11/17/2011, at 27 (stating that Appellee did not purposefully give false answers); *id.* at 34 ("I don't think he's actually

lying."); *id.* at 151 ("I didn't feel there was significant malingering."). The PCRA court also observed Dr. Spangler's testimony that Appellee's motivation may have caused him to work more slowly on Dr. Crown's test, and therefore may have depressed his score by up to fifteen points. PCRA Ct. Op. at 7. Even by this measure, however, Appellee's score remained in the range for mental retardation (72).

The PCRA court was not persuaded by Dr. Spangler that Appellee's three earlier, higher I.Q. test results indicated that Appellee was not mentally retarded, accepting instead Appellee's experts' explanations about why these earlier tests were not persuasive on the factual question of whether Appellee suffers from limited intellectual functioning. The record supports the PCRA Court's acceptance of Appellee's experts' opinions instead of the Commonwealth's in this regard.

Specifically, the PCRA court noted Dr. Crown's testimony that these three scores did not change his opinion that Appellee was mentally retarded. PCRA Ct. Op. at 8; N.T., *Atkins* Hearing, 5/11/2011, at 84 (referring to the 1979 test and stating that it did not alter his opinion about whether Appellee meets the intellectual functioning prong). Specifically, Dr. Crown explained that none of the three prior tests altered his opinion that the 2009 I.Q. test, with a score of 57, represented Appellee's I.Q. because, with regard to the 1972 test administered by St. Christopher's school and the 1979 test administered by CORA, there was no information about the circumstances in which the test was administered, who administered it, whether it was a full or partial test, or how it was scored. *Id.* at 84 (referring to the 1972 test and stating that, from the report of the score, he could tell nothing about the circumstances in which the test was administered or by whom); *id.* at 84–85 (stating that as a clinician, he was unable to rely on the score reported from the 1972 test in assessing Appellee's intellectual functioning); *id.* at 82 (referring to the 1979 test and explaining "I don't know how it was administered. I don't even know whether it was—the whole WISC or whether it was a partial WISC, which is very common in school systems. And I'm not sure who actually administered it. That report is

signed by two people. One is a PhD and the other person has a master's degree."); *id.* at 84 (explaining that 1979 test did not alter his view of Appellee's intellectual functioning because "a child's development can change from year to year. So that's just one point in time."). Dr. Crown testified that with respect to the 1972 test results, it was not even clear what test was administered. *Id.* at 84.

Turning to the 1988 test, Dr. Crown explained that the Beta–2 test is not generally utilized to diagnose mental retardation and should not be relied upon in assessing intellectual functioning; rather, it is meant to yield an approximate I.Q. *Id.* at 80–81. Additionally, the Beta–2 scores do not correlate with WAIS scores, producing instead results that are approximately fifteen points higher than WAIS scores, so that Appellee's score on the Beta–2 of 82 was consistent with his 2009 WAIS score of 57 because it revealed that Appellee was in the lowest 1% of population. *Id.* at 81 ("At the tails of the distribution, the disparity is roughly 15 points from the Wexler scale. . . . [Appellee] is at the tail of the distribution. 99 of 100 people would be ahead of him. He's at the lowest, lowest point in that bell-shaped curve.").

The PCRA court further noted that Dr. Martell also testified that nothing about Appellee's older I.Q. test scores altered his opinion about Appellee's sub-average intellectual functioning. PCRA Ct. Op. at 10; N.T., *Atkins* Hearing, 5/12/2011, at 33. Specifically, Dr. Martell agreed with Dr. Crown with respect to the Beta–2 test. He explained that it is outdated, inaccurate, and tests specific non-verbal abilities rather than overall I.Q. N.T., *Atkins* Hearing, 5/12/2011, at 29–30. He further testified that whoever scored the test did so incorrectly, so that in Dr. Martell's opinion the score reported from the Beta–2 test should have been 74. *Id.* at 31. In addition, according to Dr. Martell, the Beta–2 test overestimates one's real I.Q. by ten to fifteen points, bringing the Beta–2 score more in line with the 2009 test administered by Dr. Crown. *Id.* at 31–32.

Regarding the 1972 and 1979 tests, Dr. Martell did not dispute their validity, but opined that these tests could not

account for subsequent "neurological insults" that Appellee endured as an adolescent and young adult. PCRA Ct. Op. at 8–9; N.T., *Atkins* Hearing, 5/12/2011, at 19–20 ("I think those scores [referring to the 1972 and 1979 scores] can be legitimate.... But there is significant events in his history after age 14 where he was receiving head injuries and where he was chronically exposed to poisons that attacked the nervous system...."). Explaining that the battery of tests given to Appellee by Dr. Armstrong were neuropsychological, and designed to look at the specific functions of each lobe of the brain, Dr. Martell testified that the results of such tests corroborated his testimony about neurotoxin exposure. *Id.* at 27; *id.* at 28 ("... the pesticides are known to affect certain brain functions and those are the areas in which he has particularly poor performance.").

The PCRA court additionally relied on Dr. O'Brien's testimony that Appellee's older I.Q. test results did not change his opinion that Appellee's I.Q. indicated limited intellectual functioning. PCRA Ct. Op. at 10; N.T., *Atkins* Hearing, 5/12/2011, at 178; id. at 180 ("the more current assessment [of I.Q.] is more relevant [than the older tests].") Further, Dr. O'Brien testified that the Beta–2 test was unreliable for the reasons already stated by Drs. Crown and Martell, *id.* at 183–84, and that without the raw data relating to Appellee's early I.Q. tests, the test results themselves were not reliable. *Id.* at 184 ("[W]ithout the raw data with the prior testing, we're really not in a position to assess whether or not that testing result was in fact accurate .... we really don't know if that's an accurate result.").

Finally, the PCRA court relied on the testimony of Dr. Armstrong that the I.Q. scores obtained during Appellee's childhood and adolescence were not as reliable as that obtained by Dr. Crown. PCRA Ct. Op. at 11. Specifically, Dr. Armstrong discounted the reliability of the older tests for two reasons: because no one could verify their accuracy due to the lack of data about the testing process, and because those tests occurred prior to Appellee's involvement with the sport of boxing and exposure to neurotoxins. N.T., *Atkins* Hearing,

11/15/2011, at 109 (explaining that there was no way to verify whether the prior tests were "done correctly."); *id.*, at 108 ("Well, the IQ that he had prior to his ... chemical exposure and the boxing seem like anomalies compared to the rest of his history, as well as the neurological findings, the I.Q. of Dr. Crown in 2009."); *id.* at 110 ("... as I put his information together, [the older I.Q. test scores] stand out as outliers and—so, either there's something wrong with them or the history explains that they actually declined after that.").

Based on the preponderance of the evidence standard, the evidence in the record and the testimony relied upon by the PCRA court in its opinion supports its conclusion that Appellee met the constitutional standard of limited intellectual functioning. Both Appellee and the Commonwealth presented evidence, and the PCRA court made the necessary factual and credibility determinations to decide whether Appellee met his burden of proof. It accepted Appellee's evidence, and rejected the Commonwealth's. Because its finding of Appellee's limited intellectual functioning is supported by the record, there is no basis upon which to set aside the PCRA court's factual findings; rather, we should uphold it, and should not search the record for contrary evidence that supports the Commonwealth.

Rather than examine the record to discern whether it supported the PCRA court's determinations, the Majority has, in my respectful opinion, reweighed the evidence and substituted its judgment for that of the fact finder. Such reweighing does not comport with our unassailable criteria for appellate review. *See Commonwealth v. White,* 557 Pa. 408, 734 A.2d 374, 381 (1999) ("there is no justification for an appellate court, relying solely upon a cold record, to review the fact-finder's first-hand credibility determinations."). Nor does it comport with the "highly deferential" standard of review employed in cases where an *Atkins* claim is raised. *See Crawley,* 924 A.2d at 616. In *Crawley,* we explained that the question of whether a petitioner fits the definition of mental retardation is fact intensive because it is primarily based on the testimony of experts and involves multiple credibility

determinations; thus, we will uphold the factual findings where they are supported by substantial evidence and we will uphold the legal conclusions drawn therefrom unless clearly erroneous. *Id.* "We choose this highly deferential standard because 'the court that finds the facts will know them better than the reviewing court will, and so its application of the law to the facts is likely to be more accurate.'" *Id.* (quoting *Thomas v. General Motors Acceptance Corp.,* 288 F.3d 305, 307–08 (7th Cir.2002)).

By reweighing the credibility of Appellee's expert, the Majority and the Chief Justice in concurrence have, respectfully, disregarded the evidentiary value of expert opinion, which, when rendered to a reasonable degree of professional certainty, is sufficient to support a finding of fact. *See, e.g., McMahon v. Young,* 442 Pa. 484, 276 A.2d 534, 535 (1971) ("The opinion of a medical expert is evidence. If the fact finder chooses to believe it, he can find as fact what the expert gave as an opinion."); *Commonwealth v. Meals,* 590 Pa. 110, 912 A.2d 213 (2006) (same). When Appellee's psychiatric experts testified to a reasonable degree of medical certainty that Appellee met the clinical definition of intellectual disability, therefore, Appellee had presented evidence sufficient to permit the PCRA court to find as much.

In an analogous context, we reviewed the Superior Court's reversal of a trial court's order concluding that the appellee suffered from pedophilia, and, consequently, was a sexually violent predator under Megan's Law, 42 Pa.C.S. §§ 9791 *et seq. Meals,* 912 A.2d at 214. In rejecting the Superior Court's analysis, we disapproved of its conclusion that expert opinion was insufficient to support the trial court's finding of pedophilia:

The [Superior Court's] discounting of the finding of pedophilia is also troubling because it ignores that [the] expert opinion—that, to a reasonable degree of professional certainty, appellee was a pedophile—itself was evidence. To the extent appellee felt that the expert's "diagnosis" was not fully explained, did not square with accepted analyses of the disorder, or was simply erroneous, he certainly was free to

introduce evidence to that effect and/or to argue to the factfinder that the Commonwealth's expert's conclusions should be discounted or ignored. But that argument would affect the weight, and not the sufficiency, of the expert's evidence. *See, e.g., Commonwealth v. Davido*, 582 Pa. 52, 868 A.2d 431, 442 n. 18 (2005); *cf. McMahon v. Young*, 442 Pa. 484, 276 A.2d 534, 535 (1971) ("The opinion of a medical expert is evidence")

*Meals*, 912 A.2d at 223–24.

To the extent the Commonwealth, the Majority, and the Concurring Opinion challenge the PCRA court's decision crediting Appellee's expert opinions based on credibility, that view is relevant to the weight of the evidence or even the admissibility of that evidence. *See* Pa.R.E. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Once the evidence was properly admitted, however, pursuant to *McMahon* and *Meals*, the PCRA court was within its discretion to "find as a fact what the expert gave as an opinion." *McMahon*, 276 A.2d at 535. For instance, turning to the PCRA court's specific factual findings relative to the first criteria of low intellectual functioning, the Majority accuses the PCRA court of "dismissing" Appellee's pre-*Atkins* I.Q. scores because the Commonwealth was unable to prove the veracity or accuracy of the earlier tests, and asserts that the Commonwealth is not required to do so because it is Appellee's burden to prove mental retardation. Maj. Op. at 600–01, 99 A.3d at 31. The PCRA court, however, did not dismiss Appellee's pre-*Atkins* scores; it considered them and found them less reliable as an accurate indicator of Appellee's intellectual functioning than the 2009 test administered by Dr. Crown and the other evidence presented by Appellee. Moreover, it did not make this determination based on the Commonwealth's failure to verify the accuracy of the tests; it considered the lack of supporting data about the testing conditions as pointed out by

defense testimony and accepted the proffered proposition that the most recent I.Q. test was the most reliable. The court also relied on Dr. Martell's and Dr. Armstrong's conclusions that Appellee's exposure to neurotoxins and involvement in boxing subsequent to the pre-*Atkins* I.Q. tests also added to the decline in his I.Q. score.

While it is unequivocal that Appellee bears the burden of proving his mental retardation, the burden is by a preponderance of the evidence. The PCRA court found that Appellee factually met this burden notwithstanding higher scores on earlier I.Q. tests because it credited the testimony of Appellee's experts. These are factual and credibility determinations to which we are bound, and I see no basis to set aside such determinations as they are supported by the record.

Apparently arguing in the alternative, the Majority notes that defense experts did not claim that Appellee's 1972 and 1979 scores were inaccurate, but merely stated they were unreliable because of the absence of supporting information. Maj. Op. at 600–01, 99 A.3d at 31. While the Majority is correct that the experts did not claim that the 1972 and 1979 tests were inaccurate, the salient point is that they, in their expert opinions, were not persuaded by these two scores to alter their opinions about Appellee's intellectual functioning. Drs. Crown and O'Brien explained their reasoning in this respect by observing the lack of information to substantiate the reliability of the reported scores, Drs. Martell and Armstrong hypothesized that these earlier tests were administered before subsequent events decreased Appellee's neurological functioning, and Dr. O'Brien opined that the most recent I.Q. test score was the most accurate representation of Appellee's present intellectual functioning. While the Commonwealth presented contrary evidence, the PCRA court credited Appellee's experts' opinions and accepted their assertions that the 1972 and 1979 tests were not the best indicator of Appellee's intellectual functioning.

Examining the testimony of Dr. O'Brien, the Majority finds an apparent contradiction in his reliance on the 2009 I.Q. test administered by Dr. Crown, even in the purported absence of

raw data attending that test. Maj. Op. at 600–01, 99 A.3d at 31. Dr. O'Brien, however, accepted the testimony of the other experts, including Dr. Crown, regarding the validity and reliability of the 2009 testing and scoring. N.T., *Atkins* Hearing, 5/12/2011, at 185 (". . . the reliability of that testing [referring to the 2009 test] was found to be intact."); *id.* at 186 (stating that he routinely relies on psychological testing that has been done by other psychologists and "subjected to the same type of reliability analysis that Dr. Martell undertook with the testing performed upon Mr. Hackett. In my opinion there's nothing to indicate that the testing is not reliable."). Unlike the Majority, I see no contradiction in this witness finding unpersuasive older tests for which there was no supporting data, and finding persuasive the most current test which several other experts had examined for administration, scoring, and reliability.

Further, Dr. O'Brien credited the score derived by Dr. Crown because it was the most recent in time, and therefore most relevant. N.T., *Atkins* Hearing, 5/12/2011, at 180. Dr. O'Brien also explained that he relied on Dr. Crown's score because the test that was administered is "the primary test utilized for the purposes of assessing intelligence in terms of determining if an individual meets the diagnostic criteria for mental retardation," and was therefore more reliable than other tests. *Id.* at 183. Additionally, Dr. O'Brien explained that the 1979 test administered by CORA was suspect because the purpose of that test was to determine if Appellee could be mainstreamed in special education within the public school system, and, despite resulting in a score of 85, which is above the range for mental retardation and suggests that mainstreaming was appropriate, the decision that followed was not to mainstream Appellee. *Id.* at 182.

The Majority next asserts that Appellee's own experts offered conflicting opinions with regard to whether the pre-*Atkins* scores were reliable: "[W]hile Dr. Crown refused to rely on Appellee's early I.Q. scores and Dr. Armstrong did not comment on the reliability of these tests, Dr. Martell felt Appellee's first two test scores, which were above the thresh-

old of mental retardation, were reliable." Maj. Op. at 602, 99 A.3d at 32. This assertion, however, misses the point. Dr. Martell did not state that the older tests were reliable; he stated that he did not care and therefore would not opine about their reliability because they were administered prior to the later events that, in his opinion, decreased Appellee's neurological functioning, specifically, boxing and exposure to neurotoxins. In relevant part, Dr. Martell testified as follows:

> I'm not going to quibble about those tests and those scores [referring to the older tests]. . . . I think those scores can be legitimate. He certainly had an 85 on that WISC in 1979 when he was 14–years old. But there is significant events in his history after age 14 where he was receiving head injuries and where he was chronically exposed to poisons that attacked the nervous system and were taken off the market. . . .

N.T., *Atkins* Hearing, 5/12/2011, at 19–20; *id.* at 64 ("There are unknowns about those tests . . . I'm not going to quibble about those scores. It's quite possible those are valid or at least close approximations to what his I.Q. was at that time."); *id.* at 66 ("I don't quibble with that [the 1979 score] because what I see is the big problem here occurred after that test."). It is apparent that Dr. Martell did not view the older tests as relevant, even if the 1979 score could be considered valid.

Next, the Majority asserts that there is no basis in the record for the PCRA court's finding that, according to Dr. Crown, Appellee's earlier test scores would have been "nullified" by factors such as "inconsistent testing conditions, wildly divergent median ranges, and out-of-date testing measures (known as the 'Flynn effect')." Maj. Op. at 601, 99 A.3d at 31. Although the Majority is correct that Dr. Crown did not opine that the earlier tests were unreliable for these reasons, Dr. Crown explained other reasons for not being persuaded by the earlier tests, specifically, the lack of information about the circumstances of the test, and his belief that the most recent test was the most accurate indication of Appellee's intellectual functioning. The record supports the PCRA court's acceptance of Dr. Crown's expert opinion in this regard.

Although the Majority is factually accurate that Dr. Armstrong expressed an opinion that "the Flynn effect" should adjust Appellee's older scores downward because of outdated norms, but that such adjustments did not bring the scores into the range of mental retardation, this opinion was tangential to the doctor's testimony, which focused primarily on the neurological impact of events that transpired following the administration of the earlier tests. N.T., *Atkins* Hearing, 11/15/2011, at 184 (after explaining the Flynn effect, stating "[b]ut, as I said earlier, those scores which were ... before the age of 18 ... were taken before he had other insults to his brain ...").

The Majority asserts that Appellee was never diagnosed as having mental retardation. This is incorrect, as all of Appellee's experts agreed that he has mental retardation. N.T., *Atkins* Hearing, 5/11/2011 at 53; *id.* at 56; *id.* at 65; *id.* at 79; *id.* at 92; *id.* 5/12/2011 at 56; *id.* at 60; *id.* at 144; *id.* at 178; *id* at 194; *id.* at 196; *id.* at 212; *id.* 11/15/2011 at 101; *id.* at 142; *id.* at 174; *id.* at 219. If the Majority is suggesting that the lack of a diagnosis of mental retardation prior to age 18 dooms a claim of mental retardation, Maj. Op. at 601–02, 99 A.3d at 31–32, with all due respect, we have never held that a formal diagnosis of mental retardation arising prior to age 18 is a criteria pursuant to *Miller*. To the contrary, we have accepted evidence of diminished intellectual functioning and age of onset that fall short of a formal diagnosis arising before age 18. *See, e.g., Williams*, 619 Pa. 219, 61 A.3d 979 (affirming PCRA court's finding of mental retardation in the absence of a childhood diagnosis of mental retardation). While it would clearly be an easier case if Appellee had been diagnosed with mental retardation prior to turning eighteen, the PCRA court properly considered the evidence presented and the testimony of Appellee's experts, who diagnosed Appellee with mental retardation.

The Majority next asserts that Dr. Martell conceded that Appellee's label of "brain injured," which was how the Ashbourne school classified him, could have indicated Appellee merely had learning disabilities. Maj. Op. at 601–02, 99 A.3d at 31–32. Dr. Martell's testimony, however, also indicates that the term encompassed children with mental retardation.

N.T., *Atkins* Hearing, 5/12/2011, at 75 ("Learning disability is a kind of brain damage. Mental retardation is a kind of brain damage. They don't necessarily result from brain injury but they reflect abnormal brain functioning."). Similarly, although the Majority characterizes the testimony of Dr. Armstrong as indicating that Appellee's mental impairment was consistent with other neurological abnormalities, it is clear from her entire testimony that in her opinion Appellee has mental retardation. Dr. Armstrong conducted a neurological assessment, involving a battery of 45 tests, and made overall findings, and concluded that Appellee has intellectual disability, which she explained is the current terminology to describe mental retardation, in accord with the three prongs adopted to define mental retardation in *Miller.* N.T., *Atkins* Hearing, 11/15/2011, at 96; *id.* at 101; *id.* at 135–36. The Commonwealth challenged her opinion on cross-examination, but she was consistent that, in her opinion as a neuropsychologist, looking at the totality of the evaluations and reports, Appellee has mental retardation. *Id.* at 149–165.

The Majority is, I believe, unfairly critical of the PCRA court for not distinguishing between students with learning disabilities and those with mental retardation. The Commonwealth cross-examined Dr. Armstrong with regard to whether it was possible that all of Appellee's limitations could be ascribed to learning disabilities rather than mental retardation, and Dr. Armstrong explained that learning disabilities and mental retardation were not discreet categories, that someone who has mental retardation will likely also have learning disabilities. N.T., *Atkins* Hearing, 11/15/2011, at 158 ("And, yes, learning disability is not a—some other diagnosis that's separate from intellectual disability or mental retardation. It's a part of it."). There is nothing in the PCRA court's opinion that betrays of lack of understanding in this regard. *See* PCRA Ct. Op. at 11 (referencing Dr. Armstrong's opinion that Appellee has an intellectual disability, or mental retardation).

Next, the Majority expresses skepticism of Dr. Crown's opinion that there was no indication that Appellee intentionally

depressed his I.Q. score by a lack of effort. Maj. Op. at 602–03, 99 A.3d at 32. In this regard I would also note that Dr. Spangler, the only expert who did not believe that Appellant's I.Q. was in the range of mental retardation, rejected the score derived by Dr. Crown because he believed that Appellee's motivation to work slowly could have artificially depressed his score by about fifteen points. Thus, even by the Commonwealth's own speculation about this slow-down effect, Appellee's most recent I.Q. score indicates that it is still within the range of mental retardation, at 72 (the uncontested actual score of 57 plus 15). Moreover, the fact remains that Dr. Crown testified that nothing the Commonwealth offered altered his opinion that there was no evidence of a lack of motivation with regard to the 2009 I.Q. test. N.T., *Atkins* Hearing, 5/11/2011, at 177–178.

In particular, the Commonwealth played for Dr. Crown the recorded conversation in which Appellee indicated his intent to play the "nut role" and "beat the system," and Dr. Crown was still not persuaded to alter his opinion. *Id.* at 176. While the Majority may not agree with Dr. Crown, the fact remains that it was his expert opinion, as a neuropsychologist. Moreover, it was bolstered by multiple other experts as well as lay witnesses. The PCRA court was well within its discretion to consider credibility, and to accept this testimony.

The Majority also takes the PCRA court to task for not considering that there may be a powerful incentive to malinger and to slant evidence to establish mental retardation. Maj. Op. at 601–03, 99 A.3d at 32–33 (citing *Commonwealth v. DeJesus*, 619 Pa. 70, 58 A.3d 62, 85–86 (2012)). Although "[t]he prospect of malingering and the incentive to slant evidence to influence a finding of mental retardation are relevant considerations to argue to the *Atkins* factfinder in an appropriate case," *id.* at 85, there is no indication that the factfinder in this case failed to scrutinize such considerations. The thrust of the Commonwealth's presentation of evidence with regard to Appellee's I.Q. score was that his prior I.Q. scores were more accurate indicators of his intelligence than the most recent test administered by Dr. Crown precisely

because of Appellee's *Atkins* motivation to do poorly. Every expert who testified, however, stated that Appellee was not malingering, and the only expert to speculate about Appellee's motivation to work slowly did not expect such a motivation to depress his score beyond 15 points, *see, e.g.* N.T. *Atkins* Hearing, 11/17/2011, at 139 (Dr. Spangler testifying that a lack of motivation will decrease an I.Q. score by an average of 15 points), thus rendering the effect harmless within the context of the considered issue. The PCRA court relied on all of the experts, including the Commonwealth's, in this respect. PCRA Ct. Op. at 8.

The Majority also disregard's the PCRA court's acceptance of Appellee's experts' opinions that the decrease from his earlier I.Q. scores (the 1972 score (80) and the 1979 score (85)) to the 2009 I.Q. score of 57 was attributed to neurological impairments that happened after 1979. Maj. Op. at 602–03, 99 A.3d at 32–33. According to the PCRA court, Dr. Martell testified that Appellee likely suffered dementia as a teenager as a result of boxing and from exposure to neurotoxins from his family's kennel and his contact with chemicals in his lawn care business. PCRA Ct. Op. at 8. The court then observed the evidence in the record that from the age of ten until he left home at 18, Appellee used creosote four to five times a year, inhaling the vapors and absorbing it through his skin, and was exposed to the pesticide Sevin, which the family used to treat the dogs for fleas and ticks. *Id.* at 8–9. When Appellee started his lawn care business, he was exposed to malathion, which he used to treat lawns without a respirator or protective clothing. *Id.* at 9. The court noted that in 1990 these products were found to cause mental retardation. *Id.* As further evidence that Appellee suffered from neurological impairments as a result of boxing and his exposure to neurochemicals, the PCRA court relied on the testimony of Dr. Armstrong, who concluded, based on her administration of 45 neurological tests, that Appellee had "an unusually severe profile of neuro-psychological impairments." PCRA Ct. Op. at 11; N.T., *Atkins* Hearing, 11/15/2011, at 96.

The Majority asserts that the defense did not demonstrate a causal connection between the chemicals to which Appellee

was exposed, specifically, creosote, Sevin, and malathion, and his subsequent drop in I.Q. However, Dr. Armstrong asserted in her report that Sevin "inhibits cholinesterase, and is also linked with memory impairment," and that "Malathion binds with cholinesterase, and causes memory impairment in humans." Reproduced Record (R.R.) Vol. 3, 18R. Dr. Martell testified that these chemicals are organophosphates which kill the nervous system of humans. N.T., *Atkins* Hearing, 5/12/2011, at 22; *id.* at 26 ("One of the things with these neurotoxins is they are cumulative. They are stored in the fat in our bodies. The fat kind of concentrates and magnifies them. So the more you are exposed to it, the more it builds up in your system and then the more corrosive it is on your brain and nervous system."); *id.* at 158 (Dr. Martell noting that creosote was banned in 1990 because of the risk it posed to the nervous system).

As Dr. Armstrong explained, the chemicals with which Appellee had worked in the past have been discovered to cause brain injury, specifically impacting the memory.[6] She continued that these chemicals also affect the central nervous system and neurological functioning.[7] On cross examination,

6. Dr. Armstrong testified:

He was working with a lot of toxic chemicals that we know cause brain injury, specifically to memory, probably beyond memory, but results from studies—they're depending on animal studies—where we know how to test memory. Studies aren't being done on humans for obvious reasons. And so—in any case, we know that the chemicals—that he worked with insecticides, even herbicides, the creosote, all can cause destruction of the laying down of memory, destruction of memory systems.

N.T., *Atkins* Hearing, 11/15/2011, at 103.

7. Specifically, she testified as follows:

... it's not just the creosote. It's—it's the carbaryl, which is known to cause memory loss; the malathion, which is an insecticide, that affects—that's known to affect the CNS [central nervous system] and it causes a variety of neurological symptoms in humans including memory ... And even the herbicides that he used, the Roundup that he used to spray around the lawns, that causes abnormal cell signaling. These insecticides tend to accumulate in fatty tissues. So they don't—they're not breathed out or metabolized quickly. They remain in the body for awhile. So these are drugs that we know that would affect neurological functioning.

Dr. Armstrong explained that mental retardation is a neurological problem, and neurological problems result from repeated, excessive exposure to chemicals that effect the nervous system. N.T., *Atkins* Hearing, 11/15/2011, at 213–216. Acknowledging that malathion is used to treat head lice, Dr. Armstrong testified that this was controversial, as many disagreed with its use for that purpose, and that using it one time was of a different degree than its repeated use causing a buildup in the body. *Id.* As a neurologist, the neurological impact of these chemicals was within the witness's expertise. Moreover, the Commonwealth attempted to discredit her, and she did not waiver from her opinion that repeated exposure, as experienced by Appellee, would have had a neurological impact. She notably verified that Appellee in fact had neurological impairments through her testing and evaluation of him. Thus, in her expert view, his objective status was consistent with her expectation premised on his history. I see no error in the PCRA court accepting her opinion, and I disagree with the Majority that the record does not support the PCRA court's findings and conclusions in this regard.

In a similar vein, the Majority asserts there was no evidence that Appellee was ever injured during his participation in the boxing program, undermining the PCRA court's factual finding on this matter. Maj. Op. at 602–03, 99 A.3d at 32–33. However, Dr. Armstrong's report indicated that the neurological defects she encountered were consistent with "boxing and sparring with frequent head blows." R.R. Vol. III at 18R. Moreover, she obtained this information from Appellee. N.T., *Atkins* Hearing, 11/15/2011, at 104 ("He told me that he had— I asked him to try to quantify how many blows to the head and gave different estimates and he could choose what he thought fit. And he said probably at least a hundred blows to his head."). Appellee's mother testified that in addition to one significant blow, there were other injuries that caused her concern. *Id.* at 15 ("... he came home with just too many injuries. There were times when he would go to bed at six o'clock at night and I'd have to go and keep waking him up,

N.T., *Atkins* Hearing, 11/15/2011, at 105–06.

just to make sure that he was all right."); *id.* at 71 ("There were plenty of other times where his ear would be swollen or, you know, bruised eye, things of that nature."). Whether the Majority believes that this evidence was credible is not relevant. The fact finder accepted Ms. Hackett's testimony and Dr. Armstrong's opinion in this regard, and there is record support for it. Because the PCRA court's finding of subaverage intellectual functioning was amply supported by the record, this Court is bound by these factual findings.

Moving to whether Appellee demonstrated "significant adaptive limitations," *Williams,* 61 A.3d at 983, which is the second factor from our definition of mental retardation in *Miller,* we have explained that "[a]lthough an individual's I.Q. score is the primary measurement for limited intellectual functioning, because the interaction between limited intellectual functioning and deficiencies in adaptive skills is necessary to establish mental retardation, a sufficiently high I.Q. score, in itself, will not bar a court from finding an individual is mentally retarded." *Williams,* 61 A.3d at 983; *Miller,* 888 A.2d at 630–31. Similarly, a low I.Q. score will not "in itself categorize a person as mentally retarded." *Williams,* 61 A.3d at 983; *Miller,* 888 A.2d at 630–31.[8] In addressing the

8. We have defined adaptive behavior as "the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives, and limitations on adaptive behavior are reflected by difficulties adjusting to ordinary demands made in daily life." *Williams,* 61 A.3d at 983–84; *Miller,* 888 A.2d at 630. According to the AAIDD, significant limitations in adaptive functioning means "performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social and practical skills." *Williams,* 61 A.3d at 983–84; *Miller,* 888 A.2d at 630. In addition,

The DSM–IV requires significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. For assessing adaptive ability, the DSM–IV also considers "the suitability of the instrument to the person's socioeconomic background, education, associated handicaps, motivation, and cooperation.... In addition, behaviors that would normally be considered maladaptive (e.g., dependency, passivity) may be evidence of good adaptation in

adaptive behavior criteria, we have accepted that the focus is on an individual's weaknesses, not his strengths. *Williams,* 61 A.3d at 992.

The PCRA court heard from five experts—four for Appellee and one for the Commonwealth—as well as lay witnesses, over the course of several days. It considered the evidence presented, weighed the expert opinions, made credibility determinations, and ultimately found, based on the totality of the evidence, that Appellee demonstrated the adaptive limitations required by the *Miller* test to prove mental retardation. PCRA Ct. Op. at 15. There is a wealth of evidence to support this finding.

Specifically, Dr. Martell testified that in his opinion, under the DSM–IV guidelines, Appellee was impaired in five of the eleven categories: functional academics; social and interpersonal skills; self-direction; self-care; and safety. All of the defense experts agreed with Dr. Martell in this regard. N.T., *Atkins* Hearing, 5/12/2011, at 38 (Dr. Martell); *id.* 5/11/2011, at 65–66 (Dr. Crown); *id.* 11/15/2011, at 135–36 (Dr. Armstrong); *id.* 5/12/2011, at 197–99 (Dr. O'Brien). The PCRA court accepted this testimony and thus was within its discretion to conclude that Appellee was impaired in these five adaptive functioning categories.

With respect to functional academics, Dr. Martell reviewed Appellee's academic records and found clear evidence of impairment in this category. For instance, Appellee had to repeat the first grade three times. N.T., *Atkins* Hearing, 5/12/2011, at 40 ("I've seen a lot of people. I think this is the first time I've ever seen someone who had to repeated [sic] first grade three times. That to me speaks of a very early onset and profound impairment that one would need to do that."). As a result, he was placed in the Ashbourne school, where he was labeled "brain injured" and "required intensive one on one support and supervision as he continued to struggle academically, was consistently behind his grade level [aca-

the context of a particular individual's life (e.g., in some institutional settings)."
*Williams,* 61 A.3d at 983–84 (internal citations omitted).

demically], . . . and had difficulty understanding abstract concepts." PCRA Ct. Op. at 11–12; N.T., *Atkins* Hearing, 5/12/2011, 41 ("[Appellee] took this Metropolitan Achievement Test at age nine-and-a-half and that placed his math and reading scores at the second grade level, which is significantly below where one should be at that age."); *id.* (noting that a progress report from when Appellee was ten stated that he "seems to still have difficulty with abstract aspects such as the months, time and the relationship between such things as continents, countries, states and cities."). *See also* N.T., *Atkins* Hearing, 5/12/2011, at 40 (reading from a 1980 individualized education plan for Appellee that provided: "The multidisciplinary team finds [Appellee] to be brain injured and unable to benefit from a special education program . . . at a public school special education class at this time."); *id.* at 41–42 ("So after age 10 when he would be in fifth grade, he's functioning at a second grade level. And then finally by . . . age 16 he was only functioning at a sixth grade level in reading and fourth or fifth grade level in math.").

In addition, Appellee's former teacher from the Ashbourne school, Judy Pezola, testified that she taught him for a year from 1974–75, and that the school was for "kids who were labeled learning disabled; kids who were labeled brain injured; kids who were labeled emotionally disturbed . . ." N.T., *Atkins* Hearing, 5/11/2011, at 9. Ms. Pezola recalled that when Appellee was ten years old, he read at a second grade level and could not independently complete age appropriate academic work. *Id.* at 12.

With regard to social and interpersonal skills, the PCRA court noted Dr. Martell's testimony that Appellee's school records indicated significant deficits in this skill area, referring to an Ashbourne school progress report referring to his susceptibility to manipulation, N.T. *Atkins* Hearing, 5/12/2011, at 47 ("[Appellee] allows himself to be manipulated by his classmates."), and another progress report indicating that he did not interact appropriately with his peers and did not tolerate frustration adequately. *Id.* ("Past and present teacher observation indicate that [Appellee] does not interact ap-

propriately with any of his peers. Does not tolerate frustration adequately."); PCRA Ct. Op. at 13.

In accepting Dr. Martell's testimony about Appellee's social and interpersonal skills, the PCRA court noted that it was consistent with testimony it heard from lay witnesses such as Appellee's mother and aunt, who testified that as a child Appellee had few friends, had trouble making friends, and preferred to socialize with children who were much younger. PCRA Ct. Op. at 13; N.T., *Atkins* Hearing, 5/13/2011, at 9–11; *id.* at 82.

Turning to the skill area of self-direction, the PCRA court accepted Ms. Pezola's testimony that Appellee required structure and supervision to complete a task, and that it was necessary to provide step-by-step instructions to him. PCRA Ct. Op. at 13; N.T., *Atkins* Hearing, 5/11/2011, at 30. The PCRA court found this testimony consistent with other testimony that Appellee was able to follow specific instructions of limited scope and duration on his own, but was unable to follow directions on relatively simple activities, such as learning to jump rope. PCRA Ct. Op. at 14; N.T., *Atkins* Hearing, 5/13/2011, at 10.

Similarly, with respect to the skill area of self-care, the PCRA court accepted Appellee's expert's opinion that his history demonstrated impairments in this area. PCRA Ct. Op. at 15. Specifically, the PCRA court accepted testimony that Appellee frequently wet the bed until age ten or eleven; suffered from enuresis (self-wetting) into his teens; had difficulty tying his own shoes and using utensils consistently; and needed supervision while getting dressed to prevent him from wearing his clothes backwards or putting his shoes on the wrong feet. N.T., *Atkins* Hearing, 5/12/2011, at 48–49.

Finally, as to safety, the fifth skill area which Dr. Martell identified Appellee as impaired, the PCRA court accepted Appellee's evidence of several instances which showed, in the opinions of the experts, a dangerous disregard for his own safety. Specifically, the PCRA court noted one instance where Appellee injured himself when he climbed a tree and

attempted to remove branches with a chainsaw while intoxicated. PCRA Ct. Op. at 15; N.T., *Atkins* Hearing, 5/12/2011, at 50; N.T., *Atkins* Hearing, 11/15/2011 at 210. Additionally, on one Fourth of July, Appellee held onto a lit firecracker until it exploded, and, at another time, alarmed his family members by jumping into a waterfall without any regard for his safety. PCRA Ct. Op. at 16–17; N.T., *Atkins* Hearing, 5/12/2011, at 135–36.

Accepting this testimony, and finding it credible, the fact finder concluded that Appellee demonstrated adaptive limitations as required by the *Miller* definition of mental retardation. In reaching this conclusion, the PCRA court considered the evidence from Appellee's life that indicated a lack of adaptive functioning and the expert's testimony providing insight into this evidence, and ultimately concluded, as the experts testified, that some limited adaptive functioning in Appellee's employment did not undermine the specific lack of adaptive functioning in the five skill areas identified by Dr. Martell.

To the extent the Majority is critical of Dr. Martell's opinion about Appellee's functional academics, alleging it was formed without a complete review of all of Appellee's school records, *see* Maj. Op. at 603–04, 99 A.3d at 33, this fact was brought out on cross-examination, and Dr. Martell stated that the records he had not reviewed did not alter his opinion. N.T., *Atkins* Hearing, 5/12/2011, at 113. Similarly, the Majority notes that although some members of Appellee's family claimed he could not tie his shoes and that he wet himself, Ms. Pezola (his former teacher at the Ashbourne school) could not recall such problems. This type of conflicting testimony is proverbial in these cases, and is for the fact finder to evaluate. After careful consideration, the PCRA court accepted the family members' testimony. The fact that there is evidence to the contrary in the record does not invalidate the PCRA court's finding.

Further, the Majority faults the PCRA court for failing to recognize that when Appellee injured himself after he climbed a tree and attempted to remove tree branches, he was intoxicated. To the contrary, however, the PCRA court explicitly

recognized this. PCRA Ct. Op. at 15. The court nevertheless accepted Dr. Martell's characterization of this incident as one of three demonstrating deficits in the skill area of personal safety.

Next, the Majority asserts that the PCRA court should have considered evidence that, in his adult life, Appellee had no adaptive limitations that prevented him from running a business. Maj. Op. at 603–05, 99 A.3d at 33–34. However, the PCRA court heard evidence about Appellee's work in this regard, and also heard expert testimony that this evidence did not alter the experts' ultimate opinions. Indeed, it is noteworthy that Dr. Martell declined to find that Appellee demonstrated a lack of adaptive functioning in the skill area of work, which is one the eleven aspects identified in the DSM–IV. *See Williams*, 61 A.3d at 983–84; n.3, *supra.* The PCRA court acknowledged that Appellee operated two businesses, completing tasks that required a low level of intellectual ability and which could be learned by repetition, PCRA Ct. Op. at 15, and with the assistance of friends and family. *Id.;* N.T., *Atkins* Hearing, 11/15/2011, at 25. Ultimately, the PCRA Court accepted the testimony of Appellee's experts that none of Appellee's actions or responsibilities were inconsistent with a diagnosis of mental retardation. Again, this conclusion was well within its sound discretion.

Further, the Majority highlights evidence in the record that shows that Appellee was manipulative and could communicate effectively. Maj. Op. at 603–04, 99 A.3d at 33–34. This evidence, however, was presented to the experts and the PCRA court, and the court found that because Appellee showed adaptive limitations in five of the eleven categories, he had met his burden of proving adaptive limitations as defined by the DSM–IV and adopted by this Court in *Miller.*

The PCRA court further considered evidence about a telephone conversation recorded while Appellee was incarcerated, in which he explained stock trading and difficult trading concepts to his mother, finding credible the conclusions of Appellee's experts that there was no evidence he actually understood what he was saying, and, further, that even if

Appellee understood the concepts he was explaining, it did not alter their opinion that he was mentally retarded. N.T., *Atkins* Hearing, 5/11/2011, at 129–131 (Dr. Crown stating that mentally retarded people can invest in the stock market and calculate their gains or losses); N.T., *Atkins* Hearing, 11/15/2011, at 144 (Dr. Armstrong opining that hearing Appellee discuss stock trading did not alter her opinion in any respect); N.T., *Atkins* Hearing, 5/11/2011, at 165 (Dr. Crown testifying that with respect to learning about stock trading, Appellee is educable and could have been repeating something he heard); N.T. *Atkins* Hearing, 5/12/2011, at 188 (Dr. O'Brien testifying that "... I think the comments about the stock sales and stuff like that, I think it's all part of that sort of bravado to try to show how normal he is and how active he is, how functional he is.").

The PCRA court was capable of finding that Appellee is mentally retarded despite the evidence presented by the Commonwealth and relied on by the Majority as demonstrating his adaptive capabilities. Maj. Op. at 603–08, 99 A.3d at 33–35. *See Williams*, 61 A.3d at 992 (holding that "[t]he PCRA court was capable of finding appellee is mentally retarded although he is the main provider for his family and able to hold basic jobs. As expressed by several of appellee's experts, the focus should be on an individual's weaknesses—not his or her strengths—as mentally retarded people can function in society and are able to obtain and hold low-skilled jobs, as well as have a family."). We have explained that the DSM–IV and AAMR's definitions of mental retardation accept an individual's classification as mentally retarded "even though he may have relatively strong skills in distinct categories." *Id.* Accordingly, the Majority's suggestion that the PCRA court erred in finding that Appellee has significant adaptive deficiencies because he could communicate effectively, run a lawn care business with the assistance of family, or plan the murder for which he was convicted, is erroneous.

The final criteria for mental retardation is onset of the condition before age 18. *Miller*, 888 A.2d at 630. As support for finding this criteria, the PCRA court relied on the individ-

ualized education plan from 1980 that stated Appellee was "brain injured" and unable to benefit from public school special education, N.T., *Atkins* Hearing, 5/12/2011, at 40; and a 1974 progress report from the Ashbourne school stating that Appellee had difficulty grasping abstract concepts and could not form letters correctly, *id.* at 42. PCRA Ct. Op. at 17. Additionally, the court relied on evidence that when Appellee was ten years old, he was reading at a second grade level, and when he was sixteen, he was functioning at a sixth grade level in reading, and a fourth or fifth grade level in math. *Id.;* N.T., *Atkins* Hearing, 5/12/2011, at 42. The PCRA court noted that this evidence was corroborated by testimony from Ms. Pezola and Appellee's family members. The court's finding as to this last criterion from *Miller* is adequately supported in the record.

On the last page of the PCRA court's opinion, it indicates that it reviewed all of the testimony and the submitted briefs, and found that Appellee met, by a preponderance of the evidence, the threshold definition of mental retardation defined by this Court in *Miller*. PCRA Ct. Op. at 19. The PCRA court "found the testimony by [Appellee's] witnesses regarding these claims of intellectual development to be credible, reliable, and persuasive and now holds accordingly that relief should be granted." *Id.* Given the testimony offered by numerous lay witnesses, the opinions of five experts, four of whom testified Appellee has mental retardation, and the various records and reports, the PCRA court's determination that Appellee met his burden of establishing that he has mental retardation is supported by the record. I believe this Court is constrained to affirm, notwithstanding individualized preferences to the contrary, and therefore dissent from the Majority's improper re-weighing of the evidence.

Justices SAYLOR and TODD join this dissenting opinion.